**[This opinion has been published in *Ohio Official Reports* at 73 Ohio St.3d 323.]**

THE STATE OF OHIO, APPELLEE *v*. FRAZIER, APPELLANT.

[Cite as *State v. Frazier*, 1995-Ohio-235.]

*Criminal law—Aggravated murder—Death penalty upheld, when—Evidence— Admissibility of statements made during alleged plea discussions—Evid.R. 410, analyzed.*

1. In determining admissibility of statements made during alleged plea discussions, the trial court must first determine whether, at the time of the statements, the accused had a subjective expectation that a plea was being negotiated. The trial court must then determine whether such an expectation was reasonable under the circumstances. (Evid.R. 410, analyzed.)

(No. 94-681—Submitted May 23, 1995—Decided August 23, 1995.)

APPEAL from the Court of Apeals for Cuyahoga County, No. 62667.

———————————

{¶ 1} On November 8, 1990, between 5:00 and 5:15 in the morning, appellant Richard Frazier murdered his former stepdaughter, Tiffany Skiba. Skiba was found in her bedroom by her maternal grandfather. She had been stabbed nineteen times in the neck, arms, and torso.

{¶ 2} Appellant was Skiba's former stepfather. Appellant and Susan Bednarski, Skiba's mother, had been married from 1980 to 1989. During their marriage, Bednarski and appellant had five children. In February 1988, while appellant was out of state, Bednarski learned that appellant had sexually abused Skiba and that she was pregnant. Bednarski sought a divorce from appellant.

{¶ 3} In September 1988, a Medina County sheriff's deputy took Skiba's statement regarding the sexual abuse. In October 1988, appellant was indicted in Medina County on two counts of rape, one count of gross sexual imposition, and one count of sexual battery.

**{¶ 4}** The Medina County court ordered appellant to submit to a blood test to determine the paternity of Skiba's son, born September 1, 1988. While appealing the court-ordered blood test to the court of appeals, the Ohio Supreme Court, and the United States Supreme Court, appellant was released on bond. The United States Supreme Court denied certiorari on October 1, 1990.

**{¶ 5}** The trial court set appellant's blood test for November 13, 1990. The rape trial was originally scheduled for December 5, 1990, but was later continued to January 14, 1991.

**{¶ 6}** Upon appellant's return to Ohio and while he was out on bond on the rape charges, Bednarski and Skiba were both frightened of what appellant might do. Bednarski saw appellant drive slowly past their house on numerous occasions. A friend of Skiba's also testified that she saw appellant drive slowly by Bednarski's house. When the friend told Skiba what she saw, Skiba responded, "Heather, oh, my God. He found me. He is going to kill me." Appellant was also seen following Skiba's school bus to the school.

**{¶ 7}** Skiba received counseling from September 1989 to May 1990. The counselor testified that Skiba was suicidal in October 1989. At a conference with her mother's attorney in October 1989, Tiffany was "petrified" during a discussion concerning the appellant. At a later visitation hearing at which appellant was present, Skiba appeared to be upset, "pale, shaky," and "very frightened." After Skiba moved in with her grandparents, she told her uncle that she was afraid of appellant and of what he might do to her. She also told him that she slept with a knife under her pillow.

**{¶ 8}** Shortly after her divorce from appellant was final, Bednarski remarried. Appellant approached Bednarski's new husband on several occasions. On one, appellant indicated that he wanted to resolve some legal matters. Bednarski replied, "That's up to the state and the attorneys." Appellant responded, "You use

2

your attorneys. I'm going to do it in an illegal way." Appellant's friends later threatened David Bednarski.

{¶ 9} One week prior to the murder, appellant sent Skiba a Halloween card asking her to call him. Two days before the murder, appellant rented a car from the Cleveland airport.

{¶ 10} On the day of the murder, Robert Skiba, Tiffany Skiba's grandfather, drove his wife to work at a nearby hospital at 5:00 a.m. and returned home approximately fifteen minutes later, according to their usual morning schedule. He returned home at approximately 5:15 a.m. Upon his return, Robert Skiba noticed the family dog barking loudly and looking toward the back of the house. He testified that this was unusual behavior for the dog.

{¶ 11} At approximately 10:00 a.m., he called upstairs for Skiba to get up to get ready for work. After receiving no response, he went upstairs and discovered Skiba's body in bed, her arms covered with blood.

{¶ 12} Next to Skiba's body, police found a broken steak knife belonging to a set owned by the grandparents. There was blood on the bed and the surrounding area. Police found smears of blood matching Skiba's blood type on the right side of the stairway leading down from her second floor bedroom and on the door frame leading to the living room. Police also found human blood on the steak knife, bedroom ceiling, door frame to the rear door, and stairwell landing leading upstairs. The quantity was insufficient to determine blood type.

{¶ 13} Entry into the house was gained through a basement window. The screen had been torn from the window and the pane of glass was broken. The window was partially open. The ground near the window was disturbed, and the door leading from the basement into the house, normally closed, was found ajar.

{¶ 14} Two footprints heading away from the murder scene were found in the neighbor's garlic bed on the other side of the fence that separated the Skibas'

home from their neighbor's home. Police made plaster casts of both prints. The footprints were made by a size nine or ten boot sold exclusively by K-Mart.

{¶ 15} On the morning of the murder appellant went to a medical clinic to have a one-inch cut on his right wrist treated. Appellant appeared nervous and was pacing around the room. He said that he cut his arm at approximately 7:00 a.m. while working on his truck. The wound was consistent with a stab wound.

{¶ 16} Later that same day, appellant contacted a friend to move his car. The friend refused, having heard on news reports that appellant was a suspect in the murder of his former stepdaughter. Appellant then contacted another friend to move his car. While the friend was driving the car, police stopped him. The police instructed the man, Jeffrey Weisheit, to get out of the car. Before the officer had the opportunity to finish his commands, Weisheit exited the car with his hands in the air and began shouting, "Don't shoot."

{¶ 17} The night of the murder, appellant drove his rental car to Ned Shamon's home in Sheffield Lake, Ohio. Shamon and appellant then returned to appellant's apartment in Shamon's wife's car to pick up various papers and articles of clothing. Appellant spent the weekend with the Shamons. On November 12, 1990, Shamon followed appellant to a gas station, where he returned the rental car. A clerk recognized appellant from news reports. The clerk called the police and provided them with the license plate number and a description of the truck that followed appellant. Police found a human blood stain on the rental car's front passenger seat, but there was an insufficient amount to determine the type.

{¶ 18} After receiving the clerk's call, the police went to Shamon's home and arrested appellant. Among appellant's effects, police found a wristwatch with a human blood stain on the band, a pry bar stained with human blood, and a letter from the United States Supreme Court denying certiorari for his appeal.

{¶ 19} Among other personal effects of the appellant's, police found a receipt from K-Mart for a size nine boot similar to that which made the print in the

Skiba's neighbor's garlic garden. A knife, with human blood traces, and a towel smeared with appellant's blood were found at his apartment. The blood on the knife was unsuitable for typing.

{¶ 20} Anthony Skiba, Skiba's uncle, testified that he had shown appellant how to break into the Skiba's basement window when they were locked out of the house. Appellant was also familiar with the basement and the storage area because he had stored some personal items in the basement while he and Bednarski were married.

{¶ 21} On November 12, 1990, police read appellant his *Miranda* rights and interviewed him while he was in custody in the Medina County Jail. Appellant voluntarily waived his rights and was subsequently asked a series of questions regarding Skiba's murder. At that time, police officers noticed that appellant had a number of bruises and abrasions on his hands and arms as well as a sutured cut on the outside of his right wrist.

{¶ 22} On November 13, 1990, Cleveland police officers took appellant to the Cleveland Clinic for the blood test ordered by the Medina County court. The test showed a 99.8% probability that appellant was the father of Skiba's son.

{¶ 23} During an interview with the police on November 14, 1990, appellant made several inculpatory statements.

{¶ 24} Appellant was indicted on three counts. The first count was for aggravated murder, defined as a purposeful killing while committing, or attempting to commit, or while fleeing immediately after committing or attempting to commit aggravated burglary. Count One contained three specifications: that the murder was committed while committing or attempting to commit or fleeing immediately after committing or attempting to commit aggravated burglary and the offender was the principal offender or committed the murder with prior calculation and design, that the victim was a witness and was purposely killed to prevent her testimony, and that the murder was committed for the purpose of escaping trial and/or

punishment for another offense committed by him, to wit, rape. Count Two was also for aggravated murder committed purposely with prior calculation and design, and contained the same three specifications as contained in Count One. Count Three charged appellant with aggravated burglary under R.C. 2911.11.

{¶ 25} A jury was impaneled and trial ran from August 5 through August 14, 1991. On August 16, 1991, the jury returned a verdict of guilty on all three counts and also found that the three specifications under Counts One and Two were each proved beyond a reasonable doubt. A mitigation hearing followed the verdict, in which appellant made an unsworn statement denying his guilt. On August 19, 1991, the jury returned with a recommendation that appellant be sentenced to death. The court followed the jury's recommendation, making an independent finding that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. Appellant was sentenced to death on August 29, 1991.

{¶ 26} The court of appeals affirmed the decision of the trial court.

{¶ 27} The cause is presently before this court as a matter of right.

_____

*Stephanie Tubbs Jones*, Cuyahoga County Prosecuting Attorney, and *Edward M. Walsh*, Assistant Prosecuting Attorney, for appellee.

*Stever, Escovar & Berk Co., L.P.A.*, and *Thomas J. Escovar*; *McGinty, Gibbons & Hilow Co., L.P.A.*, and *Henry Hilow*, for appellant.

_____

**WRIGHT, J.**

{¶ 28} R.C. 2929.05(A) mandates that we undertake a three-prong-analysis when reviewing a capital case. First, we must consider the specific issues raised by the appellant with regard to the proceedings below. Second, we must independently weigh the aggravating circumstances in this case against any mitigating factors. Third, we must independently consider whether appellant's sentence is disproportionate to the penalty imposed in other similar cases.

6

{¶ 29} For the reasons that follow, we uphold appellant's conviction and affirm the sentence of death.

I. Jury Issues

A. Voir Dire

{¶ 30} In Propositions of Law IV and V appellant argues that the court improperly dismissed two jurors for cause. In Proposition of Law VI appellant argues that the trial court utilized a different standard in ruling on defense challenges for cause than it did on the prosecution challenges. In Propositions of Law XIV and XV, appellant attacks the jury instructions given by the trial court.

{¶ 31} The trial court dismissed two jurors for cause when they stated that they would not commit to follow the law if their personal views conflicted with the law.

{¶ 32} "The proper standard for determining when a prospective juror may be excluded for cause based on his views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath. (*Wainwright v. Witt* [1985], [469 U.S. 412, 105 S.Ct. 844] 83 L.Ed.2d 841, followed.)" *State v. Rogers* (1985), 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus, vacated on other grounds (1985), 474 U.S. 1002, 106 S.Ct. 518, 88 L.Ed.2d 452.

{¶ 33} Additionally, "since there will be situations where the trial court is left with a definite impression that a prospective juror would be unable to faithfully and impartially apply the law, deference must be given to the trial judge who sees and hears the juror." *State v. Beuke* (1988), 38 Ohio St.3d 29, 38, 526 N.E.2d 274, 284-285.

{¶ 34} Prospective juror Algirdas Nasvytis gave conflicting answers as to whether he would be able to vote to impose the death penalty. When initially questioned, Mr. Nasvytis stated that he was philosophically against the death penalty, that it would be difficult for him to sign a piece of paper that authorized

the imposition of death, and that he would not "know until I [got] there" whether he could authorize the imposition of the death penalty. Nasvytis also stated that he would want to be convinced "beyond any doubt" before he would sign a document authorizing the imposition of the death penalty and that he held doubts as to whether he could follow the law and authorize the imposition of the death penalty. When defense counsel asked, "Are you saying unequivocally that under no circumstances you would follow the instruction of the judge and fairly consider the imposition of the sentence of death in a particular case?" Nasvytis responded, "I don't care what the law is, okay, I am going to do what I think is right."

{¶ 35} However, when the defense attorney asked Nasvytis, "[Y]ou might not like to do it, but you would follow the law and vote to impose the death penalty," Nasvytis responded, "Yes, I would say yeah." When defense counsel again asked whether, in a properly proven case, Nasvytis could follow the law and impose the death penalty, Nasvytis responded, "Depends, I suppose I could." When the trial judge inquired exactly what he meant, Nasvytis indicated that if something personal would happen to his family, there is a possibility that his "vacillating would vacillate toward the more serious choice."

{¶ 36} If a trial court finds that a juror has expressed unwillingness to follow the court's instructions, the ability of defense counsel to elicit somewhat contradictory views from the juror does not, in and of itself, render the trial court's judgment erroneous. *State v. Beuke*, 38 Ohio St.3d at 38, 526 N.E.2d at 284.

{¶ 37} Nasvytis's responses to the questions reflect a juror who desired to follow the instructions in the abstract, but made it clear that he could not follow Ohio law when required to decide the issue of capital punishment. The trial judge ruled that Nasvytis indicated that "under some circumstances, if a relative were a victim, he would follow the law; in other circumstances, he would not follow the law. He does not believe he is bound by the law. He is, in fact, excused for cause."

{¶ 38} Appellant also challenges the dismissal of prospective juror Elizabeth Lasky. The voir dire of Lasky was similar to that of Nasvytis. In response to the court's questions and to the state's questions, she responded that she had reservations about imposing the death penalty, that ethically she was against the death penalty, and that she probably would not be able to follow the law. In response to defense counsel's questions, she responded that the law must be obeyed and that the law would take precedence over her personal feelings. However, Lasky stated three times that she could not make the commitment to follow the law above her own feelings.

{¶ 39} As stated above, defense counsel's ability to elicit contradictory views does not render the trial court's judgment erroneous. *State v. Beuke*, 38 Ohio St.3d at 38, 526 N.E.2d at 284. The trial court correctly excused Lasky for cause.

{¶ 40} Appellant contends that the *Rogers* standard is error, and asks the court to modify that standard to comport with the supposedly stricter standard set forth in R.C. 2945.25(C). However, this court previously rejected this argument in *State v. Roe* (1989), 41 Ohio St.3d 18, 553 N.E.2d 1351, 1357, and held that the statute does not impose a stricter standard. This case presents no compelling reason to alter this position.

{¶ 41} Upon thorough review of the voir dire transcript, we find that the trial court's denial of appellant's objection to the state's challenge for cause is supported by the record. Therefore, appellant's argument for reversal on this issue has no merit.

B

{¶ 42} In Proposition of Law VI, appellant contends that he was deprived of due process when the trial court applied a different standard in ruling upon defense challenges for cause than it applied in ruling upon similar prosecution challenges. Appellant argues that the trial court should have dismissed Judy Ballard

and Harold Wills for cause because of their personal beliefs in favor of the death penalty.

{¶ 43} As stated above, the standard for excluding a prospective juror for cause based on his views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath. *State v. Rogers*, 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, paragraph three of the syllabus.

{¶ 44} Ballard and Mills both repeatedly stated that, although they felt the death penalty was a justifiable punishment for someone who takes another person's life, they would put their personal feelings aside and follow the law, even if that meant that they had to impose a sentence less than death. The trial judge did not perceive that their views would prevent or substantially impair the performance of their duties as jurors. Furthermore, the trial judge believed that Ballard and Mills would faithfully and impartially apply the law.

{¶ 45} The trial judge did not apply different standards in ruling upon defense challenges for cause than it did for the state's challenges. The distinction is that Lasky and Nasvytis both stated that they could not put aside their personal feelings and would not be able to follow the law. Ballard and Wills stated that they would be able to put aside their personal feelings and they would apply the law as instructed by the trial judge.

{¶ 46} Additionally, Ballard sat as an alternate and did not participate in the jury deliberations. Defense counsel specifically stated, "[W]e are satisfied with the alternates, and we would pass [on the peremptory challenge]." Appellant's proposition of law is without merit.

## II. Jury Instructions

{¶ 47} In Propositions of Law XIV and XV, appellant criticizes the jury instructions given by the court in relation to the definition of "foreseeability" and the definition of "reasonable doubt." Appellant asserts that the definitions used by

the trial judge deprived him of his due process rights so that his conviction should be reversed and he should receive a new trial.

{¶ 48} The trial judge used the definition of "reasonable doubt" provided in R.C. 2901.05(D).[1] We have previously upheld the constitutionality of this jury instruction. See *State v. Nabozny* (1978), 54 Ohio St.2d 195, 8 O.O.3d 181, 375 N.E.2d 784, paragraph two of the syllabus, vacated on other grounds, 439 U.S. 811, 99 S.Ct. 70, 58 L.Ed.2d 103. We reaffirmed this position in *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph six of the syllabus, and *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph eight of the syllabus. This case presents no compelling reason to alter our position. Appellant's assertion that the definition of reasonable doubt provided in R.C. 2901.05(D) enables a juror to determine guilt or innocence based upon a clear and convincing standard is without merit.

{¶ 49} Accordingly, we maintain our position and hold that the definition of reasonable doubt provided in R.C. 2901.05(D) accurately imparts the concept of reasonable doubt and does not diminish the state's requirement to prove guilt beyond a reasonable doubt.

{¶ 50} Appellant's assertion that the jury instruction in regard to foreseeability was misleading to the jury, allowing them to find appellant guilty of aggravated murder using a negligence standard, is incorrect.

---

1. The jury instructions regarding reasonable doubt read as follows:

"Reasonable doubt is present when you, the jurors, after you have carefully considered and compared all the evidence, cannot say that you are firmly convinced of the truth of the charge. It is doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs and depending on moral evidence is open to some possible or imaginary doubt.

"Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs.

"If, after a full and impartial consideration of all the evidence, you are firmly convinced of the truth of the charge, the State has proved its case beyond a reasonable doubt.

"If you are not firmly convinced of the truth of the charge, then you must find the defendant not guilty."

**{¶ 51}** In a portion of the jury instructions, the trial judge used the definition of "foreseeability" formerly provided in 4 Ohio Jury Instructions ("OJI") (1992) 70-71, Section 409.56. This instruction has been criticized in *State v. Jacks* (1989), 63 Ohio App.3d 200, 204-205, 578 N.E.2d 512, 515, and *State v. Burchfield* (1993), 66 Ohio St.3d 261, 611 N.E.2d 819.

**{¶ 52}** In *Jacks*, the Eighth District Court of Appeals overturned a murder conviction when it found that the trial court's causation instruction improperly allowed the jury to find the defendant guilty on the basis of negligent, rather than purposeful, behavior. The *Jacks* court found that the instruction undercut the mens rea requirement for murder.

**{¶ 53}** In *Burchfield*, the trial court used essentially the same language regarding causation as was used in *Jacks*. However, in *Burchfield* there were extensive instructions regarding purpose given prior to the causation instruction, which included the instruction that purpose can be inferred from the use of a deadly weapon. The court also reiterated the purpose requirement. Additionally, the prosecutor and defense in *Burchfield* made it very clear in their closing arguments that in order to return a verdict of guilty, the jury had to determine that appellant acted with the intent to kill.

**{¶ 54}** In *State v. Thompson* (1987), 33 Ohio St.3d 1, 12-13, 514 N.E.2d 407, 419, this court reiterated our earlier holding in *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772, paragraph four of the syllabus, that a "jury instructions '*** must be viewed in the context of the overall charge, ***' rather than in isolation."

**{¶ 55}** The instructions the trial judge gave in this case are similar to the acceptable instructions given in both *Burchfield* and *Thompson*. In this case, the trial judge did not rely solely on the instructions provided in OJI. The trial judge elaborated on the instructions and provided a thorough explanation of causation both before and after the OJI portion of the instructions. The trial judge included

the instruction that purpose can be inferred from the use of a deadly weapon. Additionally, as in *Burchfield* the state also made it clear in closing arguments that in order to return a verdict of guilty, the jury had to determine that appellant acted with the intent to kill.

{¶ 56} When viewed in its entirety, the jury instructions given by the trial court in this case did not prejudice appellant.

### III. Indictment

{¶ 57} In Proposition of Law VIII, appellant argues that the aggravated burglary charge and the aggravating circumstances incorporating the aggravated burglary charge must be dismissed because the indictment is "fatally flawed," as the indictment did not specify the felony appellant intended when he broke into the victim's grandparents' house.  Appellant asserts that he was deprived of notice of the charges against him.

{¶ 58} Crim.R. 12(B)(2) requires that objections to the indictment be brought before trial.  Appellant did not object to the alleged flaw in the indictment until after the prosecution finished presenting its case-in-chief.  Thus, other than plain error, appellant has waived any argument concerning the validity of the indictment.

{¶ 59} In *Russell v. United States* (1962), 369 U.S. 749, 763-764, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240, 250-251, the Supreme Court set out two criteria by which the sufficiency of an indictment is to be determined: "[F]irst, whether the indictment 'contains the elements of the offense intended to be charged, "and sufficiently apprises the defendant of what he must be prepared to meet,"' and, secondly, '"in case any other proceedings are taken against him for a similar offence [*sic*] whether the record shows with accuracy to what extent he may plead a former acquittal or conviction." ***'"

{¶ 60} In overruling appellant's motion to dismiss Count Three for being defective on its face and to dismiss the specifications in Counts One and Two for

13

the same reason, the trial court ruled that Count Three and specification one of Counts One and Two gave adequate notice, given the aggravated murder counts included in the indictment. The court of appeals agreed. We concur with the judgment of the lower courts.

{¶ 61} Appellant was not misled or prejudiced by the failure to define the specific felony included in Count Three of the indictment. It is clear from the specifications in Counts One and Two that the state intended to establish that appellant entered the Skibas' house with the intent to commit aggravated murder. The state did not present evidence of any felony other than aggravated murder. Additionally, the parties agreed that the judge should define the felony when giving the aggravated burglary instruction.

{¶ 62} Appellant was sufficiently apprised of the charges against him and was adequately protected against double jeopardy. Appellant's alleged error was not so grievous that "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. Therefore, appellant's arguments are without merit.

IV. Evidentiary Issues

A. Photographs

{¶ 63} In Proposition of Law XIII, appellant argues that the trial court erred when it permitted the prosecutor to use fourteen "cumulative" and "gruesome" photographs during the trial. Appellant asserts that admission of the photographs was highly prejudicial and requires reversal. Appellant argues that because he did not dispute the manner or cause of Skiba's death, there was no material issue and therefore the autopsy photographs of how the victim died had no probative value. Appellant's assertion is without merit.

{¶ 64} Under Evid.R. 403 and 611(A), the admission of photographic evidence is left to the discretion of the trial court. *State v. Maurer* (1984), 15 Ohio

St.3d 239, 264, 15 OBR 379, 401, 473 N.E.2d 768, 791. "Properly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence. as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." *Id.* at paragraph seven of the syllabus.

**{¶ 65}** As we stated in *Maurer*, "the fact that appellant stipulated the cause of death does not automatically render the photographs inadmissible." *Id.* at 265, 15 OBR at 401, 473 N.E.2d at 792. Additionally, "relevant evidence, challenged as being outweighed by its prejudicial effects, should be viewed in a light most favorable to the proponent of the evidence, maximizing its probative value and minimizing any prejudicial effect to one opposing admission." *Id.* at 265, 15 OBR at 402, 473 N.E.2d at 792, citing *United States v. Brady* (C.A.6, 1979), 595 F.2d 359.

**{¶ 66}** The photographs herein, numbering fourteen, were not repetitive or cumulative. The autopsy photographs were introduced during the coroner's testimony to illustrate the testimony. Each photograph presents a different perspective of the victim. The photographs were used to illustrate the twenty-one stab wounds and other cuts, many of which were defensive in nature. On balance, we find that their probative value substantially outweighs the danger of unfair prejudice to appellant.

### B. Evid.R. 410

**{¶ 67}** In Proposition of Law XI, appellant contends that his offers to plead guilty to the rape and murder charge in exchange for a definite term sentence were inadmissible under Evid.R. 410.

**{¶ 68}** Evid.R. 410, as amended July 1, 1991, reads, in part, as follows:

"(A) *** evidence of the following is not admissible in any civil or criminal proceeding against the defendant who made the plea or who was a participant personally or through counsel in the plea discussions:

"***

"(5) Any statement made in the course of plea discussions in which counsel for the prosecuting authority or for the defendant was a participant and that do not result in a plea of guilty or that result in a plea of guilty later withdrawn."

{¶ 69} Prior to July 1, 1991, Evid.R. 410 read, in part, as follows: "[E]vidence of a plea of guilty, later withdrawn, or a plea of no contest, *** or of an offer to plead guilty or no contest to the crime charged or any other crime, or of statements made in connection with, and relevant to, any of the foregoing pleas or offers, is not admissible in any civil or criminal proceedings against the person who made the plea or offer."

{¶ 70} Appellant asserts that the July 1, 1991 amendments to Evid.R. 410 should *not* apply because they "would not be feasible, and would work an injustice, contrary to the requirements of Evid.R. 1102, and because the use of the amendments amounts to an unconstitutional retroactive or ex post facto application of the amendments."  Appellant further argues that even if the courts apply the amended version, the discussion should have been excluded because Tim McGinty, a Cuyahoga County assistant prosecutor, was present.

{¶ 71} The facts surrounding the alleged plea bargain are as follows.  On November 14, 1991, appellant requested a meeting with Detective Svekric. Originally, Svekric told appellant he could not meet with him for a few days. After this discussion, Svekric notified Lieutenant James and Prosecutor McGinty of the conversation.  Svekric was advised that he should go to the jail as appellant requested.  The three men went out to the Medina County Sheriff's office to speak with appellant.  Svekric and James met with appellant and read him his *Miranda*

rights, which appellant voluntarily waived. Appellant insisted that he understood that he had the right to have an attorney present during the interview.

{¶ 72} Svekric and James informed appellant that they were not interested in the Medina (rape) case, that they were only interested in the murder of his former stepdaughter. Appellant informed the detectives he had information about other murders involving the Hell's Angels. The detectives once again informed appellant that their sole purpose for being there was to discuss the Skiba murder with him. Appellant requested that the conversation be "off the record." The detectives informed him that this was not possible, that anything he said could be used against him in court. Appellant was asked a series of ten questions concerning Skiba.[2] Appellant was then asked additional questions concerning the last day he worked that month and about the rental of a Honda automobile. Appellant responded that he had a reason for renting the car but that he was not going to say what at that time.

{¶ 73} Appellant then began to question what the detectives could do for him. He stated that he did not want to go to trial in Cleveland and asked if they could get him "a flat time" if he pled guilty. The detectives informed appellant that the only thing they could do would be to talk with the prosecutor's office and the judge and explain whether or not he had cooperated with the police, but they were

---

2. The questions read as follows:
    1. "Did you owe any money to the Hell's Angels?"
    2. "What was the last day you worked this month?"
    3. "How did you cut your wrist?"
    4. "What did you do on the day of November 8, 1990?"
    5. "How long have you known Jeffrey Weisheit?"
    6. "How long have you known Ned Shamon?"
    7. "Where did you spend the weekend?"
    8. "Why did you rent the Honda?"
    9. "When was the last time you were in the home of your in-laws on East 169th?"
    10. "How did you get the bruises on your arm?"
    Detectives then asked three other questions in connection with the original ten. The follow-up questions were in reference to the second question and the eighth question.
    Detectives then asked if appellant had an alibi for 5:05a.m. on November 8, 1990. Appellant responded that he did not have an alibi for that time.

not in a position to make any decisions as to what he could plead or what the punishment would be.

{¶ 74} Appellant then offered to plead guilty to murder or manslaughter and the impending rape charge if he could make a deal. The detectives repeated their previous statement that they had no authority to make a deal. Appellant requested that the detectives bring the Cuyahoga County assistant prosecutor back with them, at which time he would tell everything he knew about the murder of his former stepdaughter. The detectives had appellant taken back to his cell while they conferred with McGinty.

{¶ 75} The three men returned to the Medina County Sheriff's office. Appellant was brought from his cell and again read his *Miranda* rights, which he waived. When asked if he wanted to have an attorney present, appellant responded, "No." The detectives explained that he was entitled to have an attorney present and appellant responded that he did not want his attorneys to know that he was talking to the police.

{¶ 76} The detectives informed appellant that the case against him was going to be presented to the grand jury and that he would more than likely be indicted for aggravated murder. Appellant again stated that he did not want to go to trial in Cleveland and again offered to plead to a lesser charge in the rape and murder if he could "work a deal for straight time."

{¶ 77} At this time, James was called from the office. When he returned, he informed appellant that they knew of the medical clinic where he had his wrist sutured the morning of the murder. Appellant became reticent, although he continued to express an interest in entering into a plea bargain. The detectives remained firm in their statements that the most they could do was to talk to the prosecutor's office and the judge who would be assigned to the case and inform them that he had cooperated.

**{¶ 78}** Svekric then asked, "Do you want to tell us exactly what happened on November 8th with Tiffany Skiba, yes or no?" Appellant responded that he would tell them what they wanted to know, but requested that his attorneys be present. At this time, questioning ceased and appellant's attorneys were contacted.

**{¶ 79}** Through his attorneys, appellant continued to attempt to negotiate a plea. Svekric, James, and McGinty each explained that they were not in a position and had no authority to enter into a plea agreement with appellant.

**{¶ 80}** Svekric, James, and McGinty testified that they did not go to the Medina County Sheriff's office to negotiate any deals with appellant, that they were not there to offer a deal to the appellant, and that the sole purpose for the meeting was to obtain information about the death of appellant's former stepdaughter.

**{¶ 81}** Evid.R. 410, as amended, "is designed to protect plea bargaining statements involving attorneys in order to promote the disposition of criminal cases by compromise." Staff Note to Evid. R. 410. If plea negotiations actually took place, appellant's assertion that the statements should be excluded under the earlier version of Evid.R. 410 is correct. Under the amended version of Evid.R. 410, only the portion of the conversation in which Prosecutor McGinty participated would be excluded.

**{¶ 82}** However, in order to trigger the protection of Evid.R. 410, the parties must actually be involved in plea negotiations. Upon careful review of the record, we concur with the lower courts in their determination that the interview that occurred on November 14, 1990 was simply *not* a plea discussion. We would reach the same result regardless of which version of Evid.R. 410 we applied.

**{¶ 83}** The starting point of our analysis is whether the parties actually entered into plea negotiations. Plea bargaining is defined, in part, as "[t]he process whereby the accused and the prosecutor in a criminal case work out a mutually satisfactory disposition of the case subject to court approval." Black's Law Dictionary (6 Ed. 1990) 1152. In this case, appellant and McGinty clearly did not

attempt to work out a "mutually satisfactory disposition." Appellant offered to plead guilty should the detectives or McGinty "work a deal for straight time." According to the testimony offered by Svekric, James, and McGinty, any time appellant offered to plead, they informed him that they did not have the authority to enter into such an agreement. Most damaging to appellant is the testimony of his own attorney, Richard Marco. In the pretrial hearing concerning the motion to suppress, Marco corroborated the testimony offered by Svekric and McGinty. Marco testified that he was informed by the prosecutor that they were not offering, nor were they even discussing, a plea bargain.

{¶ 84} Although this issue has not been previously addressed by this court, the issue has been dealt with in the Sixth Circuit. In *United States v. Swidan* (E.D.Mich. 1988), 689 F.Supp 726, and *United States v. Gentry* (M.D.Tenn. 1980), 525 F.Supp 17, the courts applied a two-tiered analysis originally set forth in *United States v. Robertson* (C.A.5 1978), 582 F.2d 1356, 1366. Although these cases addressed Fed.R.Evid. 410, Ohio Evid.R. 410 is similar. Therefore, the same analysis can be applied.

{¶ 85} The test whether an accused's statements were made during plea discussions is to be determined on a case-by-case basis in light of all the facts. In determining admissibility of statements made during alleged plea discussions, the trial court must first determine whether, at the time of the statements, the accused had a subjective expectation that a plea was being negotiated. The trial court must then determine whether such an expectation was reasonable under the circumstances.

{¶ 86} This analysis protects the plea discussion process by preserving the accused's subjective expectations while at the same time limiting self-serving, post hoc statements by the accused.

{¶ 87} While appellant's subjective belief may be unclear, it is apparent from the motion hearing that in light of the totality of the circumstances, the parties

did not enter into plea negotiations. The record indicates that any attempts to negotiate a plea were strictly one-sided attempts on the part of appellant. Svekric, James, and McGinty repeatedly told appellant that they did not have the authority to enter into a plea bargain. They informed appellant that the most they could do would be to notify the judge that was assigned to the case that he cooperated with the investigation. When appellant's attorneys inquired about the possibility of a plea bargain, they were informed that there would not be any discussion concerning a plea bargain.

**{¶ 88}** Applying the two-tiered analysis set forth above, we agree with the lower courts in holding that the interviews that occurred between appellant, Detectives James and Svekric, and Prosecutor McGinty were not plea negotiations. Therefore, the statements were properly admitted. Proposition of Law XI is without merit.

V. State-of-Mind Evidence

**{¶ 89}** In Proposition of Law II, appellant asserts that the trial court erred by admitting evidence of Skiba's fear of appellant. Appellant alleges that this violated the rules of evidence and his due process rights.

**{¶ 90}** Appellant argues that the trial court erred in admitting evidence of Skiba's state of mind in violation of Evid.R. 402 and Evid.R. 403. Appellant's assertion is without merit.

**{¶ 91}** The trial court correctly ruled that the statements concerning Skiba's state of mind, *i.e.*, her fear of appellant, were admissible pursuant to Evid.R. 803(3) and *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 514 N.E.2d 394. The trial judge went to great lengths to ensure that the witnesses testified only to the fact that Skiba expressed fear of the appellant. The trial judge did not permit any testimony regarding the basis of Skiba's fear.

**{¶ 92}** Appellant's assertion that the trial court violated Evid.R. 402 and Evid.R. 403 by admitting "irrelevant, highly prejudicial evidence" is also not well taken. In his brief, appellant cites portions of the opening statement and closing argument of the state in addition to the testimony of various witnesses. It is well settled that statements made by counsel in opening statements and closing arguments are not evidence. Additionally, some latitude is granted to both parties in closing argument as long as counsel stays within the boundaries of the record. *State v. Byrd* (1987), 32 Ohio St.3d 79, 82, 512 N.E.2d 611, 616.

**{¶ 93}** As to the relevancy of Skiba's state of mind, Evid.R. 104 allows a trial judge discretion in determining the admissibility of evidence. *State v. Heinish* (1990), 50 Ohio St.3d 231, 239, 553 N.E.2d 1026, 1035. In this case, the court did not make an unreasonable, arbitrary or unconscionable decision in allowing witnesses to testify about Skiba's fear of appellant. Proposition of Law II is without merit.

VI. Other Criminal Acts

{¶ 94} In Proposition of Law I, appellant argues that the trial court erred by admitting evidence of other crimes committed by him, specifically evidence regarding the rape of Skiba, the allegations of sexual abuse, and the court-ordered paternity blood test. Appellant asserts that the evidence was admitted to show his propensity to commit crimes. Appellant's assertion is without merit.

{¶ 95} The evidence appellant refers to was not used to show that the appellant had a propensity to commit crimes, but to prove the aggravating circumstances with which appellant was charged.

{¶ 96} In *State v. Hector* (1969), 19 Ohio St.2d 167, 48 O.O.2d 199, 249 N.E.2d 912, paragraphs one and two of the syllabus, this court stated:

"1. As a general rule, the introduction of evidence tending to show that a defendant has committed another crime wholly independent of the offense for which he is on trial is prohibited.

"2. Exceptions to such rule are made where the prior offense is part of a common plan or scheme or where it tends to prove motive, intent, knowledge or identity, not *because* the prior acts prove that defendant is crime prone, but *in spite of* such fact, on the theory that the circumstances involved in the prior offense or offenses comprise substantial probative evidence of guilt of the particular offense in question." (Emphasis *sic.*) Evid.R. 404(B).

{¶ 97} Appellant's prosecution for the rape of Skiba was not a "wholly independent" crime. Appellant's prosecution for the rape is inextricably linked to the circumstances surrounding her murder. Evidence of the blood test would be offered as proof of appellant's paternity of Skiba's son. This was highly relevant evidence on the issue of appellant's motive to murder in order to escape punishment for the rape offense. The evidence was not offered to demonstrate appellant's propensity to commit crimes.

{¶ 98} Appellant also argues that his failure to request a specific jury instruction on this issue is not relevant because the trial court's failure to offer a limiting instruction on the rape charges *sua sponte* was plain error. "Absent plain error, the failure to object to improprieties in jury instructions, as required by Crim.R. 30, is a waiver of the issue on appeal." *State v. Underwood* (1983), 3 Ohio St.3d 12, 13, 3 OBR 360, 361, 444 N.E.2d 1332, 1333.

{¶ 99} Even if the trial judge erred in failing to give a limiting instruction on the rape evidence, the lack of instructions was not so grievous that it amounts to plain error.

{¶ 100} Although the trial judge did not offer a limiting instruction, the judge did strictly limit the rape testimony to establish that appellant raped Skiba and that he subsequently murdered Skiba to prevent her from testifying at the rape trial. Due to the manner in which the testimony regarding the rape was limited, a limiting instruction would not have changed the outcome of the trial.

{¶ 101} Proposition of Law I is without merit.

## VII. Insufficient Evidence

{¶ 102} In Proposition of Law XVI, appellant argues that his conviction was not supported by sufficient evidence to prove guilt of every element charged beyond a reasonable doubt. Appellant asserts that there was no direct evidence that he committed the crimes. Appellant alleges that the jury was "called upon to draw an inference upon an inference." Appellant's assertions are incorrect.

{¶ 103} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d

492, paragraph two of the syllabus. "Matters such as the weight of evidence and witness credibility are primarily to be determined by the finder of fact." *State v. Grant* (1993), 67 Ohio St.3d 465, 477, 620 N.E.2d 50, 65. When viewed in a light most favorable to the prosecution, the evidence of appellant's guilt is clearly sufficient.

{¶ 104} Appellant had a powerful motive to kill Skiba. Skiba had accused appellant of sexually abusing and raping her. Appellant was the putative father of Skiba's two-year-old son. Appellant's rape trial and paternity blood test were scheduled to occur within days of the murder. Skiba played a role in the divorce between appellant and Susan Bednarski. Appellant sent Skiba a Halloween card requesting that she contact him, and he was seen on a number of occasions in and around her neighborhood and following her school bus.

{¶ 105} Appellant was linked to the scene by bootprints in the neighbor's garden. He was aware of the family's daily routine and the layout of the house. The method of entry was identical to that used by his former brother-in-law when they were locked out of the house.

{¶ 106} Appellant's behavior immediately before and after the murder was unusual. Although he owned at least two operable vehicles, he rented a car two days before the murder. He received medical attention for a cut on his wrist on the morning of the murder. The attending physician testified that the cut was consistent with a stab wound. Appellant requested the help of friends in moving his car and in retrieving items from his apartment. He did not return to his apartment the weekend following the murder.

{¶ 107} The evidence suggests that the murderer knew the family's schedule, was familiar with the layout of the house, including uniquely located light switches, knew how and where to enter the home, knew where to find the victim, acted quickly to avoid detection, and did not steal or otherwise disturb anything else in the home as would be common for a burglar. Additionally, appellant's

statements to the police and his offer to plead guilty to Skiba's murder and rape in return for a definite term sentence further support an inference of appellant's guilt.

{¶ 108} When viewing this evidence in a manner most favorable to the prosecution, a reasonable trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Proposition of Law XVI lacks merit.

### VIII. Character Evidence

{¶ 109} In Proposition of Law III, appellant asserts that the prosecutor improperly introduced evidence of the victim's character during closing argument. Appellant argues that such actions constitute error and demand reversal.

{¶ 110} During closing argument at the guilt phase of the trial, the state made reference to Skiba as a "young, innocent girl" and as "a loving, caring individual." The state also placed an empty chair in the middle of the courtroom and suggested that the jury "let her [Skiba] be represented by this empty chair." The defense objected to these and other references to Skiba. The trial judge overruled some of the objections, stating that the statements were argument. Other objections were sustained and the references stricken pursuant to the defense's request.

{¶ 111} We agree with appellant that the use of the empty chair was excessive. We have previously warned prosecutors to temper their remarks and stay within the bounds of the law as established by case law. "A prosecutor is at liberty to prosecute with earnestness and vigor, striking hard blows, but may not strike foul ones." *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 318, 470 N.E.2d 883, 885, citing *Berger v. United States* (1935), 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314. Although we disagree with the methods employed by the prosecutor and warn others not to employ such methods in the future, we do not believe that this behavior influenced the jury and find, beyond a reasonable doubt, that this statement was not prejudicial.

**{¶ 112}** The Eighth District Court of Appeals upheld the allowance of the state's argument, holding that "[t]he State never put on evidence of Tiffany's quiet peaceable character ***."  Appellant argues that whether the information came in through testimony or argument, the prejudicial effect is the same.  Appellant cites *State v. White* (1968), 15 Ohio St.2d 146, 44 O.O.2d 132, 239 N.E.2d 65, in support of his position.

**{¶ 113}** Paragraph two of the syllabus of *White* states: "The use by the state of evidence of the victim's background, and reliance upon such evidence in its argument for the death penalty, is improper and constitutes error, *** [and] such error may be cause for reversal ***."  (Emphasis added.)  The errors cited by appellant occurred in the *guilt phase* of the trial, not during the penalty phase.  The state did make two similar statements during the penalty phase of the trial.  However, the trial judge sustained appellant's objections thereto.

**{¶ 114}** The state did not offer character evidence concerning Skiba.  Although the prosecutor's remarks were intemperate, the comments were not so prejudicial as to deprive appellant of a fair trial.  Not every comment by counsel can be a basis for reversal.  *State v. Maurer*, 15 Ohio St.3d 239, 267, 15 OBR 379, 403, 473 N.E.2d 768, 793.  "Parties are granted latitude in closing arguments, and the question as to the propriety of these arguments is generally considered one falling within the sound discretion of the trial court."  *State v. Loza* (1994), 71 Ohio St.3d 61, 78, 641 N.E.2d 1082, 1102; *State v. Maurer*, *supra*, 15 Ohio St.3d at 269, 15 OBR at 404, 473 N.E.2d at 794-795.  "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 318, 470 N.E.2d 883, 885.

**{¶ 115}** We find the prosecution's closing argument was not prejudicial and did not inflame the jury or influence it to render a more severe recommendation than it otherwise would have made.  Proposition of Law III is meritless.

IX. Sentencing phase

A. Prosecutorial Misconduct

{¶ 116} In Propositions of Law VII and XII, appellant contends that he was denied a fair trial by various instances of prosecutorial misconduct.

{¶ 117} When determining whether the prosecution's remarks are so prejudicial as to deny appellant a fair trial, the closing argument must be reviewed in its entirety. *State v. Moritz* (1980), 63 Ohio St.2d 150, 157, 17 O.O.3d 92, 97,407 N.E.2d 1268, 1273. In the instant cause, we conclude that such a review of the prosecutor's closing argument in its totality discloses no prejudice to the appellant.

{¶ 118} In Proposition of Law XII, appellant argues that the prosecutor violated DR 7-104(A)(1) by speaking to appellant without his counsel being present. In this proposition of law, appellant is referring to the meeting between himself, Detective James, Detective Svekric, and Prosecutor McGinty. The facts of this meeting are discussed, *supra*, in Section IIIC. Appellant contends that the prosecutor had an ethical obligation to notify appellant's attorney when appellant requested to speak with the prosecution.

{¶ 119} At the time the questioning began, appellant was clearly informed of his right to have counsel present. Appellant distinctly waived this right. The prosecution did not initiate the conversation with appellant. As soon as appellant requested that his attorneys be present for any further questioning, the interview ceased and the detectives summoned appellant's attorneys.

{¶ 120} It is clear from the record that there was no violation DR 7-104(A)(1). Proposition of Law XII is without merit.

B. Merger of Burglary and Murder

{¶ 121} In Propositions of Law IX and X, appellant contends that the trial court erred when it failed to merge the aggravated burglary and aggravated murder specifications. Appellant argues that the burglary was not a separate crime but was incidental to the aggravated murder.

**{¶ 122}** In *State v. Moss* (1982), 69 Ohio St.2d 515, 23 O.O.3d 447, 433 N.E.2d 181, paragraph two of the syllabus, this court held, "Aggravated murder, as defined by R.C. 2903.01(B), is not an 'allied offense of similar import' to aggravated burglary, as defined by R.C. 2911.11(A)(1), for purposes of application of R.C. 2941.25(A)."

**{¶ 123}** The elements of aggravated burglary and aggravated murder do not correspond to such a degree that the commission of one results in the commission of the other. "[I]n order to commit either the crime of aggravated burglary or aggravated murder, the other crime need not be committed. *** 'The two offenses are not prerequisites, one for the other. To consummate either offense, the other need not by definition be committed. Aggravated murder and aggravated burglary are never merely incidental to each other ***.'" *State v. Henderson* (1988), 39 Ohio St.3d 24, 28, 528 N.E.2d 1237, 1242.

**{¶ 124}** As the crimes of aggravated burglary and aggravated murder are not allied offenses of similar import, appellant's arguments are without merit.

## X. Constitutionality

**{¶ 125}** In Proposition of Law XVII, appellant offers various challenges to the constitutionality of Ohio's death penalty statutes. We previously have held that Ohio's death penalty statute is not violative of the United States and the Ohio Constitutions. *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph one of the syllabus; *State v. Mapes* (1985), 19 Ohio St.3d 108, 117, 19 OBR 318, 484 N.E.2d 140, 148; *State v. Lorraine* (1993), 66 Ohio St.3d 414, 426, 613 N.E.2d 212, 222; *State v. Grant* (1993), 67 Ohio St.3d 465, 483, 620 N.E.2d 50, 69. Appellant does not present any arguments that would cause us to revise our position. Proposition of Law XVII has no merit.

## XI. Cumulative Error

{¶ 126} In Proposition of Law XVIII, appellant argues that the cumulative effect of the errors in the case, even if not prejudicial individually, were prejudicial when viewed in the aggregate.

{¶ 127} We have ruled that appellant's propositions of law are without merit. We do not believe that appellant was prejudiced by errors during his trial. Accordingly, Proposition of Law XVIII must also fail.

### XII. Failure of Court of Appeals to Articulate Reasons Why the Aggravating Circumstances Outweigh the Mitigating Factors

{¶ 128} In his final proposition of law, appellant argues that the court of appeals violated the provisions of R.C. 2929.05(A) by failing to articulate the reasons why the aggravating circumstances outweighed the mitigating factors. Appellant's argument is without merit.

{¶ 129} Although the court of appeals did not state the reasons why the aggravating circumstances outweighed the mitigating factors in the supplemental journal entry cited by appellant, it clearly set forth the reasons in the full opinion dated February 17, 1994. The court of appeals did not violate R.C. 2929.05(A). The court of appeals gave adequate review to each of appellant's assignments of error. Furthermore, error, if any, in the lower courts on this ground can be cured by the independent review that we undertake in this court. Appellant's contention is not persuasive.

### XIII. Independent Weighing

{¶ 130} In evaluating the theory of residual doubt, the court of appeals described the nature and circumstances of the crime and concluded by saying: "These aggravating circumstances outweigh the residual doubt theory of mitigation beyond a reasonable doubt." It would appear that the court of appeals improperly weighed the nature and circumstances of the crime as a nonstatutory aggravating circumstance. Although this error can be cured by way of our independent review, we again caution the courts against the use of such comments.

**{¶ 131}** The jury found appellant guilty of three aggravating circumstances: (1) appellant, acting as the principal offender, committed the murder of Tiffany Skiba while committing aggravated burglary (R.C. 2929.04[A][7]); (2) appellant murdered Tiffany Skiba for the purpose of escaping detection, apprehension, trial or punishment for the rape of Tiffany Skiba (R.C. 2929.04[A][3]); (3) appellant murdered Tiffany Skiba to prevent her from testifying against him in the rape trial (R.C. 2929.04[A][8]). The court of appeals correctly determined that the acts of murdering a witness and murdering to escape punishment for another offense were part of the same act and appropriately merged these two aggravating circumstances. The jury concluded, and we concur, that the prosecution proved the remaining aggravating circumstances beyond a reasonable doubt.

**{¶ 132}** The only evidence or testimony offered by appellant in mitigation was the following unsworn statement: "Ladies and gentlemen, I know you found me guilty, and in the past I have done things that were wrong, but I am not guilty of this crime and I am asking you to please spare my life. I thank you for hearing me."

**{¶ 133}** Upon careful review of the record, we determine that there was no evidence that the victim induced or facilitated the murder; that appellant was under duress, coercion, or strong provocation; that appellant was suffering from a mental disease or defect; that appellant lacked a significant history of prior criminal convictions; and that appellant was not the principal offender in the murder of Tiffany Skiba. These mitigating factors are therefore not given any weight. Appellant's age is not a factor in this case. The nature and circumstances of the murder are not mitigating. Appellant's history, character, and background are not mitigating. Finally, appellant did not present any other evidence in mitigation that we should consider under R.C. 2929.04(B)(7). In the absence of any statutory mitigating factors, we give very little weight to the only evidence offered in mitigation—appellant's unsworn statement.

**{¶ 134}** Independently weighing the aggravating circumstances against the statutory mitigating factors, we find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

XIV. Proportionality review

**{¶ 135}** After conducting a proportionality review and comparing appellant's case with similar cases, we determine that the penalty imposed is neither excessive nor disproportionate. *State v. Wiles* (1991), 59 Ohio St.3d 71, 571 N.E.2d 97; *State v. Landrum* (1990), 53 Ohio St.3d 107, 559 N.E.2d 710; *State v. Hooks* (1988), 39 Ohio St.3d 67, 529 N.E.2d 429.

**{¶ 136}** We hereby affirm the convictions and sentence of death.

*Judgment affirmed.*

MOYER, C.J., PFEIFER and WALSH, JJ., concur.

DOUGLAS, RESNICK and F.E. SWEENEY, JJ., concur in syllabus and judgment only.

JAMES E. WALSH, J., of the Twelfth Appellate District, sitting for COOK, J.

———————————