DECISION AND JUDGMENT ENTRY
This appeal comes to us from a judgment of conviction and imposition of sentence issued by the Lucas County Court of Common Pleas following the return of a jury's verdict that found appellant guilty of aggravated murder and aggravated robbery with firearm specifications. Because we conclude that the verdict was not against the manifest weight of the evidence and appellant's constitutional rights were not violated, we affirm.
On July 21, 1999, the Lucas County Grand Jury indicted appellant, Wayne Braddy, on two counts: aggravated murder, in violation of R.C. 2903.01(B), and aggravated robbery, in violation of R.C. 2911.01(A)(1). Each count also included a firearm specification, a violation of RC. 2941.145. The charges stemmed from events which surrounded the shooting death of a thirteen year-old male, Maurice Purifie. A co-defendant, Karl Willis, was also charged with the same offenses and tried with appellant.
At trial, the state called, as its first witness, Travis Slaughter, a man who was also charged in the slaying of Purifie. In exchange for a plea agreement on this case and two other unrelated pending criminal charges,[1] Slaughter agreed to testify against appellant and co-defendant Willis.
Slaughter testified that he had used Purifie as an agent to sell drugs for him. Purifie owed him about $800 from his last deal, but had not paid. Slaughter testified that in early June 1998 he had seen Purifie, asked him for his money, and "roughed him up" when Purifie said he did not have it. Slaughter said that after that incident, he offered to pay appellant and Willis $200 to kill Purifie and get his money for him. According to Slaughter, Willis refused but appellant did not say anything in disagreement.
Slaughter then testified that, on the evening of June 13, 1998, appellant, Willis and he had been partying, drinking alcoholic beverages, smoking marijuana, and sniffing cocaine. The three young men then went out to roam the streets. Sometime in the early morning hours of June 14, 1998, they encountered Purifie walking by Robinson Junior High School. Slaughter yelled to Purifie who stopped. Slaughter said Purifie told him he was out late because his grandmother had kicked him out of her house. When Slaughter asked if Purifie had his money, Purifie said he needed more time to get it.
Slaughter then pulled a .25 caliber Smith Wesson handgun from his pocket and hit Purifie in the face and chest. Slaughter also punched Purifie, knocking him to the ground. At Slaughter's direction, appellant and Willis allegedly started to beat Purifie. Slaughter said that Willis stomped Purifie's rib cage and kicked him while appellant "was standing him, choking him." Slaughter watched as the beating continued, finally telling appellant and Willis to stop. Slaughter said that as he started to leave, Purifie stood up and began cursing and yelling threats at Slaughter. Slaughter responded by shooting him in the chest from a distance of at least an arm's length. Purifie then fell to the ground bleeding, trembling and shaking.
Slaughter stated that Willis then took the gun and fired two shots into Purifie's head. Appellant also participated by shooting Purifie. Slaughter said that appellant first fired a couple shots that grazed the side of Purifie's body and then shot Purifie twice in the head. When appellant was finished, Slaughter then took the gun from him and searched Purifie's clothing and shoes for money. Slaughter found $85 which he kept. The three men then went their separate ways.
Slaughter testified that shortly after the incident, he told his girlfriend, Shondrea Reyford, that he alone had killed Purifie. Slaughter also stated that several days later he had a confrontation with appellant who accused him of "running his mouth" about what had happened. Slaughter denied saying anything. He further testified that when appellant and he were incarcerated at the correctional center, he had another altercation with appellant. According to Slaughter, while they were being transported in an elevator with a security officer present, appellant threatened to "choke the life out of" him.[2] Slaughter said he told detectives that appellant was his enemy.
Slaughter then admitted lying many times to the police, telling them several different versions of the shooting events. When first questioned, Slaughter said he knew nothing about the murder or Purifie. In a second version, he was walking down the street and saw an unknown, shadowy person (dressed in black and wearing a mask) shoot Purifie. In yet another version, Slaughter said that he was the look out while appellant dragged Purifie to the side of the street, where Willis shot him once in the head. Slaughter also made conflicting statements as to whether Purifie sold cocaine or just marijuana for him. He also admitted that he never told police where the gun was or who his drug supplier was.
Approximately one year after his indictment, as part of a plea agreement, Slaughter agreed to tell the "truth." He then implicated appellant, Willis and himself as the shooters. Slaughter said although he initially did not want to be labeled a "snitch," he did not want guilty people on the streets who might kill another person. Pursuant to the plea agreement, the sentences for all three offenses were made concurrent, resulting in a maximum term of thirteen years.
Toledo Police Detective Gerald C. Shriefer testified that after investigating the scene of the crime, he determined that Purifie had been shot, "went down and was shot several more times where he was found laying." Shriefer opined that, because of blood marks on the ground, Purifie had then been rolled over from a side or face-down position to the face up position in which he was found. Purifie's pockets were turned inside out and his shoes were off, lying next to him. Shriefer found seven shell casings in various spots near the body. He noted that Purifie had sustained four gunshot wounds to the head, one to the chest, and two possible grazing wounds on the side of his torso. Shriefer also noted that because of gun powder marks left on the victim's clothing and skin, the wound to the chest had been made at very close proximity, within inches of the area.
Joshua Franks, a police forensic expert, testified that the shell casings and projectiles from Purifie's body were from the same gun. According to Franks, his findings indicated that the weapon used was a .25 caliber Raven, not a Smith Wesson; he noted that the markings left by these two weapons were very different.
Dr. Cynthia Beisser, a forensic pathologist with the coroner's office, testified that Purifie's death was caused by the effects of five separate gunshot wounds. She opined that one of two head wounds located close together on the back left side of the head and another located above the left ear would have been immediately fatal. The fourth wound, located on the top of the head, may or may not have been immediately fatal. She said the chest wound, although not immediately fatal, would have caused death in the absence of medical attention. Dr. Beisser also concluded that the chest wound, based upon the condition of the skin around it and internal bleeding, had been inflicted by a gun at very close range and would have been inflicted before the head wounds.
The coroner also noted that Purifie's body showed a great deal of external trauma; there was evidence of abrasions and lacerations on his face, chest, back, arms and legs. Purifie's left collar bone was fractured and there were marks and extensive bruising to the muscles in the neck, consistent with choking by the use of hands. Dr. Beisser stated that there was no sand or dirt in the wounds, indicating that he was not dragged across the ground.
Shondrea Reyford, Slaughter's girlfriend, was subpoenaed as a witness and reluctantly began testifying. However, when she refused to answer certain questions, she was found in contempt and sent to jail for thirty days. The jury was instructed to disregard her testimony entirely, and not to speculate as to the reason for her failure to answer. At this point, the prosecution rested.
Appellant then presented expert testimony from Jeffery Helmick, a criminal defense attorney. Helmick testified regarding plea bargains and the motivation and likelihood that a co-defendant might lie in exchange for lesser offenses and sentences. Helmick noted that without the plea agreement, Slaughter would be subject to a sentence of life imprisonment for the aggravated murder charge, in addition to consecutive terms for the other charges and a mandatory three years on the firearm specification. Helmick noted that Slaughter would have had to serve a minimum of twenty-three full years before having the possibility of parole, which was unlikely to be granted on first request. However, under Slaughter's plea agreement, with his sentences running concurrently (except for the firearm specification), his total time of incarceration would amount to a maximum of thirteen years. Helmick opined that the plea agreement provided a motive for Slaughter to lie and tell the police essentially what they wanted to hear. Helmick, nevertheless, acknowledged that defendants who became "snitches" often were treated badly by other inmates in prison, and that would be a negative motive to inform on someone for the sake of a plea agreement. The defense then rested.
The jury, after deliberating for approximately twenty-six hours over three days, found both appellant and Willis guilty on all counts. Both defendants were sentenced to life with parole eligibility after twenty years for aggravated murder, ten years as to the aggravated robbery offense, to run concurrently with the aggravated murder sentence, and three years mandatory consecutive term for the firearm specifications (the two specifications merged).
Appellant now appeals from that judgment, setting forth the following three assignments of error:
 "First Assignment of Error: "THE CONVICTION WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.
 "Second Assignment of Error: "THE PROSECUTOR'S MISCONDUCT DURING CLOSING ARGUMENT DENIED THE DEFENDANT DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION, AND ARTICLE 1 SECTION 10 OF THE OHIO CONSTITUTION.
 "Third Assignment of Error; "TRIAL COUNSEL'S FAILURE TO OBJECT TO INAPPROPRIATE ARGUMENT OF COUNSEL FOR CODEFENDANT RENDERED THE REPRESENTATION INEFFECTIVE, VIOLATING APPELLANT'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS, AND HIS RIGHTS UNDER SECTION 10, ARTICLE I, OF THE OHIO CONSTITUTION."
 I.
Appellant, in his first assignment of error, argues that the conviction was against the manifest weight of the evidence.
When reviewing a conviction under the manifest weight standard, an appellate court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Martin (1983), 20 Ohio App.3d 172, 175. See, also, State v. Thompkins
(1997), 78 Ohio St.3d 380. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Martin, supra, at 175.
In this case, the evidence implicating appellant came entirely from the eyewitness testimony of Travis Slaughter, who admitted being involved in the shooting. Before trial, Slaughter told several different versions of the shooting. However, defense counsel brought out these inconsistencies as well as information regarding Slaughter's plea agreement as to this case and two other offenses. While we agree that Slaughter may not have been the ideal witness, we cannot say that the testimony was so conflicting as to be incredible. In addition, the jury was instructed that appellant could also be found guilty as an aider and abettor. Even if appellant did not, in fact, fire the fatal shot, there was sufficient, credible evidence presented that he contributed to and aided Slaughter in the events and actions that resulted in the victim's death. Therefore, we cannot say that the judgment was against the manifest weight of the evidence.
Accordingly, appellant's first assignment of error is not well-taken.
 II.
Appellant, in his second assignment of error, contends that the prosecutor committed misconduct during closing arguments which violated appellant's due process rights under both the United States and Ohio Constitutions.
The prosecution and the defense have wide latitude during opening and closing arguments; questions as to the propriety of these arguments are generally left to the trial court's discretion. See State v. Loza
(1994), 71 Ohio St.3d 61, 78; State v. Brown (1988), 38 Ohio St.3d 305,317. Generally, a prosecutor's conduct at trial is not grounds for reversal unless that conduct deprives the defendant of a fair trial.Loza, supra. "The test for prosecutorial misconduct is whether the prosecutor's comments were improper and, if so, whether those remarks prejudicially affected the defendant's substantial rights." State v. Eley
(1996), 77 Ohio St.3d 175, 187; State v. Lott (1990), 159751 Ohio St.3d 160. A closing argument must be reviewed in its entirety to determine whether prejudicial effect occurred. State v. Frazier (1995), 73 Ohio St.3d 323,342.
Appellant claims that the prosecutor impermissibly referred to Willis and him as "drug dealers and murderers" and "soldiers in this war who took another body." We note, however, that the whole premise as to appellant's and Willis's involvement related directly to the collection from Purifie of drug money. When viewed in its entirety, we do not find the prosecutor's comments to be so improper as to be prejudicial to appellant's constitutional rights.
Accordingly, appellant's second assignment of error is not well-taken.
 III.
Appellant, in his third assignment of error, claims that his trial counsel's failure to object to a remarks made by counsel for a codefendant constituted ineffective assistance of counsel.
In order to prove ineffective assistance of counsel, a defendant must show 1) that defense counsel's representation fell below an objective standard of reasonableness and 2) that counsel's deficient representation was prejudicial to defendant's case. State v. Bradley (1989),42 Ohio St.3d 136, paragraph two of the syllabus. See, also, Stricklandv. Washington (1984), 466 U.S. 668, 694.
Upon a complete review of co-counsel's closing statement, we cannot discern any portion which directly or indirectly prejudiced appellant's case. Therefore, we cannot say that appellant's counsel was deficient or ineffective in failing to object to any closing remarks.
Accordingly, appellant's third assignment of error is not well-taken.
On consideration whereof, the court finds that the defendant was not prejudiced or prevented from having a fair trial, and the judgment of the Lucas County Court of Common Pleas is affirmed. Court costs of this appeal are assessed to appellant.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
James R. Sherck, J., Mark L. Pietrykowski, P.J., George M. Glasser, J.
CONCUR.
Judge George M. Glasser, retired, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.
[1] Appellant entered guilty pleas to involuntary manslaughter in this case and to two other unrelated charges; the rape of a twelve year old girl and aggravated robbery.
[2] Defense counsel brought to light the fact that the state had not presented this officer to corroborate Slaughter's testimony.