DECISION AND JUDGMENT ENTRY
This is an appeal from a judgment of the Lucas County Court of Common Pleas that found appellant guilty of one count of aggravated murder and one count of aggravated robbery, both with firearm specifications. For the reasons that follow, the judgment of the trial court is affirmed in part and reversed in part.
Appellant sets forth the following assignments of error:
 "ASSIGNMENT OF ERROR NO. 1: APPELLANT'S CONVICTION IS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.
 "ASSIGNMENT OF ERROR NO. 2: PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT DEPRIVED APPELLANT OF A FAIR TRIAL. TR 459, 464, 475-478.
 "ASSIGNMENT OF ERROR NO. 3: APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL WHEN HIS ATTORNEY FAILED TO OBJECT TO IMPROPER AND PREJUDICIAL REMARKS BY THE PROSECUTOR AS DETAILED IN THE ASSIGNMENT OF ERROR NO. 2 AND AFFIRMATIVELY PREJUDICED HIS CASE BY HIS OWN COMMENTS TO THE JURY.
 "ASSIGNMENT OF ERROR NO. 4: THE TRIAL COURT COMMITTED PLAIN ERROR IN ORDERING APPELLANT TO PAY COURT-APPOINTED COUNSEL FEES WITHOUT FIRST MAKING A FINDING AS TO APPELLANT'S ABILITY TO PAY.
 "ASSIGNMENT OF ERROR NO. 5: APPELLANT WAS PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING WHEN HIS ATTORNEY FAILED TO OBJECT TO THE ERROR SET FORTH IN ASSIGNMENT OF ERROR NO. 4."
The undisputed facts that are relevant to the issues raised on appeal are as follows. On July 21, 1999, the Lucas County Grand Jury indicted appellant on one count of aggravated murder in violation of R.C. 2903.01(B) and one count of aggravated robbery in violation of R.C. 2911.01(A)(1). Both counts included a firearm specification pursuant to R.C. 2941.145. The charges arose from the shooting death of thirteen-year-old Maurice Purifie on a Toledo street on June 15, 1998. Appellant was tried jointly with co-defendant Wayne Braddy, who was charged with the same offenses. The case was tried to a jury on January 3, 4 and 5, 2000, and the following relevant testimony was heard.
The state's first witness was Travis Slaughter. Slaughter, who was also charged with Purifie's murder, agreed to testify against appellant and Braddy in exchange for a plea agreement involving this case and two other unrelated charges. Slaughter testified that he had known both appellant and Wayne Braddy for several years and that they used to hang out together "on the streets." He further testified that Purifie had sold drugs for him many times and that in June 1999, Purifie owed him $800. Slaughter told appellant and Braddy in early June that Purifie owed him money and asked them if they would be willing to kill Purifie for $200 apiece. He testified that appellant said they should all do it together. Slaughter agreed and Braddy did not disagree.
Slaughter then testified that in the early morning hours of June 15, 1999, appellant, Braddy and he were roaming the streets when they saw Purifie walking by Robinson Junior High School. Slaughter called out to Purifie and Purifie stopped. Slaughter said that he asked Purifie if he had the money he owed and Purifie said he did not.
Slaughter then pulled a gun and used it to hit Purifie in the face and shoulder until Purifie fell to the ground. Slaughter also punched Purifie with his bare hands and then told appellant and Braddy to "fuck him up." He testified that appellant stomped Purifie in the ribs and kicked him while Braddy choked him. Slaughter watched as the two men beat Purifie and did not try to stop them. Slaughter testified that he eventually told the two men to stop and turned to walk away. When he heard Purifie cursing and yelling threats at him, he turned around and, from an arm's length away, shot Purifie in the chest. Purifie fell to the ground bleeding, trembling and shaking.
Slaughter testified that appellant then shot Purifie two times in the head. Braddy also shot Purifie approximately six times — several times in his side by his hip and then twice in the head. When Braddy stopped shooting, Slaughter took the gun from him and the three men went their separate ways. Slaughter further testified that he searched Purifie's clothing and removed his shoes to see if Purifie had any money. Slaughter found and took $85.
Slaughter testified that in late June, he told his girlfriend, Shondrea Reyford, that he had intentionally killed Maurice Purifie and that he had acted alone. He further testified, however, that what he told Reyford was a lie. He also stated that sometime after he talked to Reyford he had a confrontation with Braddy, who accused him of talking about the murder and warned him not to say anything. Slaughter further testified that he saw Braddy while they were both incarcerated and that Brady threatened to "choke the life" out of him.
Slaughter admitted that he lied to the police many times when detectives questioned him about the murder, telling several different versions of the events surrounding the shooting. Slaughter stated that he lied to the police in order to protect Braddy and appellant, as well as himself. Slaughter stated that at various times, he told the police that he did not shoot Purifie in the chest, that he was involved only as a look-out, and that he saw someone he could not identify shoot Purifie. Slaughter testified that the story he told the police after he had agreed to the plea bargain was the truth and not created for purposes of the plea. He also made conflicting statements to the police as to whether Purifie sold cocaine or just marijuana for him. Slaughter stated that he never told the police where the gun was hidden.
Slaughter further testified that the jury should believe his testimony because if they did not, there would be guilty people on the streets who might kill again and again. Pursuant to the agreement, Slaughter pled guilty to involuntary manslaughter with a firearm specification in connection with this case and to two unrelated charges.
Toledo Police Detective Gerald Schriefer described the crime scene as it appeared when he arrived shortly after the shooting. Schriefer also described the victim's wounds as he saw them at the scene and later during the autopsy. He observed four gunshot wounds to the head, one to the chest and two possible gunshot grazing wounds to the side of the torso. Purifie had bruising on his head, back, arms and legs. Schriefer further testified he believed that after Purifie was shot initially, he moved and fell down and was shot several more times as he lay on the ground. It appeared to Schriefer that Purifie had been rolled over from a face-down position to his back sometime after he was shot. Schriefer noted that one of Purifie's pants pockets was turned out and his shoes had been removed as if someone were looking for money or drugs on the body. He retrieved seven shell casings near the body and the coroner removed five bullets from the body — four from the head and one from the chest. Gunpowder residue and burn marks on Purifie's outer shirt and t-shirt indicated to Schriefer that the gun had been fired either very close to Purifie or when it was in direct contact with his shirt. Joshua Franks, a forensics expert for the Toledo Police Division, testified that the five bullets removed from Purifie's body were all fired from the same gun. He stated that the bullets were consistent with having been fired from a .25 caliber Raven.
Dr. Cynthia Beisser, a forensic pathologist with the Lucas County Coroner's office, testified as to the autopsy she performed on Purifie's body. Beisser testified that Purifie had quite a bit of bleeding in the muscles of his neck, which was consistent with trauma induced by someone else's hands. She also testified that his broken collarbone could have been caused by a blow from a handgun and that the body had two abrasions that could have been graze wounds from bullets. Beisser testified that the pooling of blood in the chest and abdominal cavity indicated that the gunshot wound to the chest was inflicted before the gunshot wounds to the head. Beisser testified that Purifie's death was caused by the combination of all of the gunshot wounds to the head. She further stated that at least two of the bullet wounds in the head could have been immediately fatal in and of themselves.
The state called Shondrea Reyford, Slaughter's girlfriend, who began testifying reluctantly. Reyford eventually refused to answer the questions asked her, despite a warning from the trial court as to the consequences, and she was found in contempt. The jury was instructed to disregard Reyford's testimony entirely.
Detective Bart Beavers testified that the police received their first lead in the investigation of this case when Shondrea Reyford informed them of Slaughter's involvement. Beavers further testified as to his role in questioning Slaughter after he was arrested in connection with the murder. At this point, the state rested.
Appellant presented the testimony of Jeffrey Helmick, a criminal defense attorney. Helmick was questioned as to possible motivations for defendants entering into plea bargains and the likelihood that someone might testify against his co-defendants in exchange for a lesser sentence. Helmick testified that without the plea agreement, Slaughter would have faced a sentence of life imprisonment if convicted of the aggravated murder charge, in addition to consecutive terms for the other charges, and a mandatory three years on the firearm specification. Helmick noted that Slaughter would have had to serve a minimum of twenty-three years before becoming eligible for parole and that parole was unlikely to be granted on the first request. Helmick explained that under the plea agreement, Slaughter faced a maximum time of incarceration of thirteen years, assuming good behavior in prison. Helmick stated that there is a real possibility of personal harm in prison to a defendant who is regarded as having been a "snitch."
On January 7, 2000, the jury found both appellant and Braddy guilty of all counts. Both defendants were sentenced to life with parole eligibility after twenty years for aggravated murder, ten years for aggravated robbery to run concurrently with the aggravated murder sentence, and three years mandatory consecutive term for the firearm specifications after the two specifications were merged. It is from that judgment that appellant appeals.
In his first assignment of error, appellant asserts that the conviction was against the manifest weight of the evidence.
When reviewing a conviction under the manifest weight standard, an appellate court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Martin (1983), 20 Ohio App.3d 172, 175. See, also, State v. Thompkins
(1997), 78 Ohio St.3d 380. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Martin, supra, at 175.
In the case before us, the evidence against appellant came entirely from the eyewitness testimony of Travis Slaughter, who admitted participating in the shooting. Slaughter admitted having told police several conflicting versions of the shooting. Defense counsel called these inconsistencies to the attention of the jury through its cross-examination of Slaughter and also brought out the plea agreement Slaughter entered into before agreeing to testify against appellant and Braddy. While an admitted murderer clearly is not an ideal witness, this court cannot find that Slaughter's testimony was without any credibility. Further, the jury in this case was instructed that appellant could also be found guilty as an aider and abettor. Even if appellant did not, in fact, fire the fatal shot, we find that there was sufficient credible evidence presented that appellant contributed to and aided Slaughter in the events and actions that resulted in Purifie's death. We therefore cannot find that the jury lost its way and created a manifest miscarriage of justice. Accordingly, appellant's first assignment of error is not well-taken.
In his second assignment of error, appellant asserts that the prosecutor committed misconduct during closing argument. Appellant argues that the prosecutor improperly commented on his view of the truth of the evidence; improperly told the jury they could not speculate on the state's failure to offer evidence on a particular issue; and improperly told the jury that they and the state should be the victim's voice against drug dealers.
The prosecution and the defense have wide latitude during opening and closing arguments and questions as to the propriety of these arguments are generally left to the trial court's discretion. See State v. Loza
(1994), 71 Ohio St.3d 61, 78; State v. Brown (1988), 38 Ohio St.3d 305,317. Generally, a prosecutor's conduct at trial is not grounds for reversal unless that conduct deprives the defendant of a fair trial.Loza, supra. "The test for prosecutorial misconduct is whether the prosecutor's comments were improper and, if so, whether those remarks prejudicially affected the defendant's substantial rights." State v. Eley
(1996), 77 Ohio St.3d 174, 187; State v. Lott (1990), 51 Ohio St.3d 160. A closing argument must be reviewed in its entirety to determine whether prejudicial effect occurred. State v. Frazier (1995), 73 Ohio St.3d 323,342.
The prosecutor's alleged comment on the truth of the evidence amounted to one sentence in which the prosecutor said that the police knew Slaughter's story that he had merely been a lookout was a lie because they had talked to Shondrea Reyford. We find that the statement was not so improper as to be prejudicial to appellant's constitutional rights.
As to the prosecutor's statement that the jury should not consider the lack of corroboration for Slaughter's testimony that Braddy threatened him, it appears when the remarks are read in their entirety that the prosecutor told the jury that, rather than speculate on what they did not hear, they should consider what they did hear and see during the trial. This was not improper.
As to the prosecutor's comments about being the voice of the victim in the fight against drugs, we find that the comments did not prejudice appellant's constitutional rights. The evidence in this case shows that the sale of illicit drugs was an overriding theme in this case and it is clear from the evidence that Purifie's death was a result of his and his assailants' involvement with drugs. The prosecutor's comments were not prejudicial.
After viewing each of the above comments in the context of the entire closing argument, we are unable to find that they prejudicially affected appellant's substantial rights. Accordingly, appellant's second assignment of error is not well-taken.
In his third assignment of error, appellant first asserts that he received ineffective assistance of counsel because his attorney failed to object to improper remarks as cited above. Based on our finding above that the prosecutor's remarks were not improper, we find this argument without merit.
Appellant also asserts that he was prejudiced by defense counsel's remarks throughout the trial that he represents people who have committed horrible crimes and by various other comments referring to the nature of the crime in this case.
In order to prove ineffective assistance of counsel, a defendant must show 1) that defense counsel's representation fell below an objective standard of reasonableness and 2) that counsel's deficient representation was prejudicial to defendant's case. State v. Bradley (1989),42 Ohio St.3d 136, paragraph two of the syllabus. See, also, Stricklandv. Washington (1984), 466 U.S. 668, 694.
This court has thoroughly reviewed the entire record of proceedings in the trial court, including defense counsel's closing argument. Many of the comments cited by appellant are taken out of context. When the closing argument is read in its entirety, it becomes clear that defense counsel's remarks did not amount to ineffective assistance of counsel. Accordingly, appellant's third assignment of error is not well-taken.
In his fourth assignment of error, appellant argues that the trial court erred by ordering him to pay court-appointed counsel fees without first making a finding as to his ability to pay.
R.C. 2941.51(D) provides, in part:
 "The fees and expenses * * * shall not be taxed as part of the costs and shall be paid by the county. However, if the person represented has, or reasonably may be expected to have, the means to meet some part of the cost of the services rendered to him, he shall reimburse the county in an amount that he reasonably can be expected to pay."
This court addressed this issue in State v. Brown (Nov. 19, 1999), Lucas App. No. L-97-1332, unreported, citing Galion v. Martin (Dec. 12, 1991), Crawford App. No. 3-91-6, unreported, in which the Third Appellate District held that:
 "An indigent defendant may properly be required to pay his attorney fees only after the court makes an affirmative determination on the record in the form of a journal entry, that the defendant has, or reasonably may be expected to have, the means to pay all or some part of the cost of the legal services rendered to him. The court must then enter a separate civil judgment for the attorney fees or any part thereof that the court finds the defendant has the ability to repay. The court may not imprison the defendant in order to compel him to pay the civil judgment of the attorney fees."
See State v. Burns (Mar. 15, 1999), Marion App. No. 9-98-21, unreported;State v. Watkins (1994), 96 Ohio App.3d 195, 198.
In the case before us, the trial court made no determination on the record that appellant was able to pay for his court-appointed counsel. Accordingly, we find appellant's fourth assignment of error well-taken.
We note that appellant sets forth a fifth assignment of error in the table of contents of his appellate brief but fails to argue that error separately in the body of his brief. Accordingly, pursuant to App.R. 12(A)(2), this assignment of error is not well-taken.
On consideration whereof the judgment of the Lucas County Court of Common Pleas is reversed as to the order to pay court-appointed counsel fees and affirmed in all other respects. This case is remanded to the trial court for further proceedings consistent with this decision. Costs of this appeal are assessed to appellant.
JUDGMENT REVERSED, IN PART, AND REVERSED, IN PART.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
 ________________________________ Richard W. Knepper, J.,
 Mark L. Pietrykowski, P.J. James R. Sherck, J. CONCUR.