OPINION
{¶ 1} Appellant, Jacob Rollins, appeals his conviction in the Stark County Court of Common Pleas for one count of aggravated murder and one count of aggravated robbery. Appellee is the State of Ohio.
 STATEMENT OF FACTS AND CASE {¶ 2} On June 20, 2006, in the Stark County Court of Common Pleas, Juvenile Division Case Number 2006JC02235, appellant, Jacob Rollins, was charged with one count of delinquency for having committed complicity to commit aggravated murder and one count of delinquency for having committed one count of complicity to commit aggravated robbery. Appellant was bound over by the Juvenile Court to the General Division of the Court of Common Pleas.
 {¶ 3} On October 31, 2006, appellant was indicted by the Stark County Grand Jury on one count of complicity to commit aggravated murder in violation of R.C. 2903.01 and 2923.03(A)(2) and one count of complicity to commit aggravated robbery in violation of R.C. 2911.01 and2923.03(A)(2), both counts included a firearm specification. Appellant pleaded not guilty to both charges. The victim in both counts is Jason Halter.
 {¶ 4} On May 14, 2007, and May 15, 2007, the matter proceeded to trial before a jury. During the trial, the State called several witnesses including Demetrius Atkins, Terry Barnby, Mark Reynolds, Tona Delong, Officer Bruce Lawver, Sergeant McWilliams, Dr. P.S.S. Murthy and Michael Short.
 {¶ 5} Demetrius Atkins testified he lives on Hoover Street between 13th Street and 14th Street, Canton, Ohio. He testified there is an alley behind Hoover Street. *Page 3 
T.136. He stated that on July 10, 2006, at around 11:00 P.M. he saw a dark colored car pull up outside his home. T.136, 139. He testified the car remained parked in front of his home for approximately 45 minutes. T. 138. He stated he saw a female driver and two male passengers in the car. T.138. He stated at some point he looked out and only saw the female driver in the car. T.140. He stated he heard three gun shots and saw two males come running from the dark alley to the car. T.140 He stated both men got into the car and "shot" down the street. T.141. He stated he then saw police circling the block, called one of the officers and told the officer what happened. T.141. He stated that, after the officers arrived, he went to the scene and saw a man in the bushes who had been shot three times. T.142.
 {¶ 6} Terry Barnby testified that he lives on 13th
Street with his family. T.144. He stated that, on July 10, 2006, at around 11:30 P.M., he was in his backyard cleaning his pool. T.147. He testified there is a fence in his back yard which is adjacent to the alley. T.148. He stated he lives near the victim, Jason Halter, and heard the side door of Jason's apartment open and heard someone go down the steps. T. 149-150. He stated his dog began tracking the fence after he heard the door of Jason's apartment open. He stated he also heard footsteps in the gravel alley. T.148. He stated that the next thing he heard was "boom, boom, boom," a handgun noise, and "gunshots" coming from the alley. T. 152-153, 163. He stated that all he heard after that was "ruffling" in the bushes like there was an animal in there. T.153.
 {¶ 7} Barnby testified he thought the noises sounded like someone had shot a cat, and it was a man's voice that sounded like Jason Halter. T.154. He heard the voice say, "they shot me", "they shot me I am going to die. Oh, God, I'm going to die." *Page 4 
T. 154-155. Barnby testified he ran into the house, told his wife to call 911, grabbed his gun and ran outside to see what was going on. T.155. When he got to the alley, he saw Jason's roommate Mark running down the street in his underwear "like a crazy lunatic." T.155. He testified that he and a neighbor, "Jack," went to the bushes behind Jack's property and found Jason "down to his last couple breaths." T.157.
 {¶ 8} Mark Reynolds testified that on July 10, 2006, he was staying at Jason Halter's house. T.168. He stated he was familiar with Tona Delong and that Jason and Tona would see each other two or three times a week. T.171. Reynolds stated that, on July 10, 2006, Tona talked to him [Reynolds] on the phone and sent him [Reynolds] text messages. T.171. Reynolds testified he took the trash out sometime after 10:00 P.M. and thought he saw Tona in a blue car with two other individuals. T. 175-176. He stated that he went back inside and asked Jason if he had seen Tona that day. Jason said no, but that they had been text messaging all day. T.177. He stated that Jason said he was going to go "over there" and asked if he could use Mark's car. T.177. He testified Tona kept texting Jason and eventually Jason left. T.178. He testified that he heard Jason open a Sprite, go out the door and down the steps. A few seconds later he heard three gunshots. T.178. He testified he ran outside half dressed, looked up the street, heard Jason "crying and yelling at the same time" and saw the bushes beside his car moving around. T. 179-180. When he got there, he just saw that "Jason was out of life." T.180. He stated that he was "upset", "freaked out", "didn't know what to think" and began running around looking for a car. T.180.
 {¶ 9} Tona DeLong testified that she had known the victim, Jason Halter, for two to three years prior to the incident and was friends with Jason's roommate, Mark *Page 5 
Reynolds. T.189 and 191. She testified that she met Justin Lucas through appellant. T.189. She testified on July 10, 2006, she "hooked up" with Lucas and appellant at around 7:30 P.M. T.190. She testified that, after 9:00 P.M., they just drove around smoking weed. T.192. She testified that during the evening she saw the appellant with a black and silver .22 caliber gun. T. 192.
 {¶ 10} DeLong testified that while they were driving around Jason Halter's neighborhood on 13th Street, she got a text message from Jason saying that he was coming over to her house. T.196. She testified that she, Lucas and appellant were smoking marijuana, and while they were driving around, they ran out of marijuana. T.204. She testified that when appellant and Lucas found out that Jason was going to come over to her house, they said they would interrupt his "way of coming over" and "then they was going to rob him" to get more marijuana. T. 195, 198, 205. She testified that, as part of the plan, she sent a text message to Jason to make sure he was coming over to her house. T.198. She testified that she parked the car on 14th
Street, and Lucas and appellant got out and went behind Jason Halter's house. T.196. She said that Lucas and appellant went through the yards and after about ten minutes she heard yelling, whistling and three gunshots. T.196. A couple of minutes after the gunshots, Lucas and appellant returned to the car and they all drove to Akron. T.197. She stated that when they returned to the car, appellant said, "it [would] probably be in the paper and that he [Jason] probably got hurt." T.197. She testified when they re-entered the vehicle Justin had the gun and Justin said "he [Justin] did it." T.205-206. *Page 6 
 {¶ 11} DeLong testified that after the incident she went to her brother's house and got a call from her sister letting her know Jason had been hurt. T.197. She stated the next day she turned herself over to the police. T. 198.
 {¶ 12} Officer Bruce Lawver of the Canton Police Department testified that, shortly before midnight on July 10, 2006, he responded to the scene of the shooting T. 215. He testified that other officers at the scene included Officer Bosley, Sergeant McWilliams, Sergeant George and Detective Clary. T. 216. He testified that the officers secured the area so people couldn't come on the scene. T. 217. He testified the area was a "poorly lit, back alley type scene." T.217. He stated he interviewed three witnesses including Demetrius Adkins, Stephanie Armsey and Mark Reynolds. T.217. He stated that, as a result of those interviews, he developed some people of interest including the appellant, Justin Lucas and Tona Delong. T.218. He stated that, the next day, he was unable to find Tona so he spoke with Tona's sister. T.219
 {¶ 13} Officer Lawver testified that, on July 11, 2006, they contacted appellant (a juvenile, age 15) at his family's home where he resided, took appellant into custody and transported him to the police department. T.221. The officer testified that during the transport, appellant made statements that, "he's not a snitch he'll do 25 if he has to." T.221. At the police department the officers took appellant's taped statement. T.243-250. Officer Lawver testified that they took two statements from appellant. Lawver stated that, after taking appellant's statement, the officers obtained a search warrant for appellant's family residence. T.351. He testified that, on July 11, 2006, during the execution of the search warrant, they recovered a semiautomatic .22 Lorcin firearm and .22 caliber ammunition. T.252-253. He testified that the firearm and ammunition were *Page 7 
put into evidence and transported to the Stark County Crime Lab to be analyzed. T.252.
 {¶ 14} In appellant's taped statements, he admitted the .22 Lorcin used in the murder was his gun. The appellant stated that he sold the gun to Justin Lucas for twenty dollars. The appellant stated he [appellant] and Justin went to Jason Halter's home so "Justin could rob him [Jason Halter]." He stated that, when Jason appeared, Justin cocked the gun and said "freeze." The appellant stated that Jason started "whimpering and breathing real hard and shaking * * * like screaming." He stated that Justin told Jason to "shut the fuck up." He stated that Justin told him to stop calling his dogs or he would shoot him. He admitted that Justin shot Jason Halter, "as fast as he could pull the trigger." Appellant stated: "we just thought of Jason as a, as a punk, as a bitch, you know what I mean, he wasn't a man to us."
 {¶ 15} Sergeant McWilliams of the Canton Police Department testified he responded to the scene of the shooting. McWilliams testified that, due to poor lighting, he did not find any shell casings during his initial response. McWilliams testified that he returned to the scene at 8:00 A.M the next morning and found two shell casings in close proximity to the blood stained grass where the victim was found. McWilliams testified that he photographed the shell casings, collected them, tagged them as evidence and sent the shell casings to the Canton/Stark County Crime Laboratory. T.338-339.
 {¶ 16} Dr. P.S.S. Murthy, the Stark County Coroner, testified that he performed the autopsy of Jason Halter. Dr. Murthy testified that the autopsy revealed Jason Halter suffered from three gunshot wounds. The first was located in his upper right arm. T.303. The second gunshot wound was in the base of the back of the neck and had *Page 8 
some soot and stippling. T.304. The third gunshot wound was located in the left upper back. T.304. Dr. Murthy stated that the first gunshot entered the chest cavity, pierced the upper lobe of the right lung, went through the windpipe (i.e. right bronchus), perforated the pulmonary artery, entered the pericardial sac that contains the heart, perforated the left side of the diaphragm and went into the abdomen close to the stomach. T.306-307. He testified that, when a lung is perforated, a lot of blood spills into the chest cavity, and, in this case, half of the victim's blood volume was in the victim's chest cavity. T.308. He testified that, in his opinion, the first gunshot wound caused Jason Halter's death. Dr. Murthy also testified that he recovered three bullets from Halter's body and sent them to the Stark County Crime Lab for analysis. T.315-317.
 {¶ 17} Michael Short, a forensic scientist from the Stark County Crime Lab, performed the lab analysis on the .22 caliber Lorcin firearm, shell casings, ammunition and bullets. Short testified that the firearm recovered from appellant's home was an operable .22 long rifle caliber Lorcin Industries Model L22 semiautomatic pistol. T.272. Short testified that he compared the spent shell casings recovered at the scene to the Lorcin Firearm. Short identified the spent shell casing as having been fired from the .22 caliber Lorcin firearm "to the exclusion of all other weapons." T.276-277. Short testified that the Winchester Super-X .22 long rifle high velocity rim fire cartridge box recovered from appellant's home contained ammunition which matched the shell casings recovered at the scene. T. 277. Short testified that the bullets recovered by the coroner from the body of the victim, Jason Halter, were consistent as having been fired from the .22 caliber Lorcin Firearm seized from appellant's home. T.279-285. *Page 9 
 {¶ 18} After the presentation of evidence, appellant was found guilty as charged in the indictment. Appellant was sentenced to serve a life prison term with possibility of parole after twenty-five (25) years plus three (3) additional consecutive years for the gun specification.
 {¶ 19} It is from this conviction and sentence that appellant now appeals, setting forth the following assignments of error:
 {¶ 20} "I. THE TRIAL COURT ERRED BY NOT EXCLUDING PHYSICAL EVIDENCE THAT WAS NOT PROPERLY AUTHENTICATED.
 {¶ 21} "II. THE APPELLANT WAS DENIED HIS RIGHT TO A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT.
 {¶ 22} "III. THE TRIAL COURT ERRED IN NOT GIVING A JURY INSTRUCTION REGARDING ABANDONMENT.
 {¶ 23} "IV. THE TRIAL COURT'S FINDING OF GUILT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE."
 I {¶ 24} In the first assignment of error, the appellant argues that the trial court erred in permitting the State to admit into evidence the three shell casings collected at the crime scene. Appellant argues that the evidence was inadmissible due to a significant break in the chain of custody. In support, appellant argues that the State failed to present evidence of the identity of the officer who collected the casings and the manner in which the shell casings were transported to the crime lab for testing. At trial, appellant did not object to the introduction of the shell casings. Appellant now raises *Page 10 
this error for the first time on appeal and argues the trial court committed plain error in permitting their introduction into evidence.
 {¶ 25} We note that the admission or exclusion of evidence is in the sound discretion of the trial court. State v. Finnerty (1989),45 Ohio St.3d 104, 109, 543 N.E. 2d 1233; State v. Sage (1987),31 Ohio St. 3d 173, 510 N.E. 2d 343, paragraph one of the syllabus. Pursuant to Evid. R. 103(A), a party's failure to object to the admission of evidence at trial constitutes a waiver of all but plain error on appeal. State v.Frazier (1995), 73 Ohio St.3d 323, 332, 652 N.E. 2d 1000; State v.Lott (1990), 51 Ohio St.3d 160, 174, 555 N.E. 2d 293, State v.Gordon (1971), 28 Ohio St.2d 45, 276 N.E. 2d 1240, at paragraph two of the syllabus.
 {¶ 26} Crim. R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." For a reviewing court to find plain error, the court "must find error, the error must be plain, which means an obvious defect in trial proceedings, and the error must have affected the defendant's substantial rights." State v. Davis, Cuyahoga App. No. 88649, 2007-Ohio-3419, at paragraph 17, citing State v.Barnes, 94 Ohio St.3d 21, 2002-Ohio-68, 759 N.E. 2d 1240. Notice of plain error under Crim. R. 52(B), "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." State v. Long (1978), 53 Ohio St. 91,372 N.E.2d 804, paragraph three of the syllabus.
 {¶ 27} Chain of custody is part of the authentication and identification process. The State's burden to establish a chain of custody is not absolute. "The State need only establish that it is reasonably certain that substitution, alteration or tampering did not *Page 11 
occur." State v. Blevins (1987), 36 Ohio App.3d 147, 150,521 N.E.2d 1105, 1109. Thus, even if a chain of custody is broken, it goes to the weight afforded the evidence, not is admissibility. Id.
 {¶ 28} In the case sub judice, Sergeant McWilliams testified he responded to the crime scene which had been closed off and secured. McWilliams testified that, due to poor lighting, he did not find any shell casings during his initial response. McWilliams testified that he returned to the scene at 8:00 A.M the next morning and found two shell casings in close proximity to the blood-stained grass where the victim was found. McWilliams testified that he photographed the shell casings, collected them, tagged them as evidence and sent the shell casings to the Canton/Stark County Crime Laboratory. T.338-339.
 {¶ 29} At the Canton/ Stark County Crime Laboratory, the shell casings were assigned laboratory number 102336. Michael Short examined the shell casings, sealed them in a zip lock bag and placed them in the secured evidence room of the Stark County Crime Lab. T.285-286. Michael Short testified that the shell casings matched the .22 caliber Lorcin firearm that was used to shoot and kill Jason Halter.
 {¶ 30} At trial, the shell casings were marked as State's Exhibit 5 and were identified by Sergeant McWilliams as being in substantially the same condition as when they were first photographed, collected, tagged into evidence and transported to the crime lab. T.341. Michael Short also identified the shell casings as being in substantially the same condition as when they were received by the crime lab and tested. T.286. *Page 12 
 {¶ 31} Nothing in the record establishes a lapse in the chain of custody from collection to trial. Furthermore, there is no evidence to suggest that the shell casings were substituted, altered or tampered with in any manner or in any manner which would have affected the admissibility, substantially prejudiced appellant or affected the outcome of the trial. On the contrary, the testimony of Sergeant McWilliams and Michael Short explained the collection, retention and handling of the shell casings prior to trial.
 {¶ 32} For these reasons, we do not find that the trial court committed plain error in permitting the introduction of the shell casings into evidence. Accordingly, appellant's first assignment of error is not well taken and is hereby overruled.
 II {¶ 33} In the second assignment of error, appellant argues that the prosecutor committed misconduct by misstating facts in closing argument. Appellant argues that the State made the comment that the bullets collected from the victim's body were fired from the appellant's gun to the exclusion of all other guns in the world. Appellant argues this comment was prejudicial to the extent that it denied appellant a fair trial.
 {¶ 34} In determining whether a prosecutor's comments constitute misconduct warranting a reversal on appeal, the reviewing court must decide (1) whether the remarks were improper, and if so, (2) whether the remarks prejudicially affected an accused's substantial rights.State v. Smith (1984), 14 Ohio St. 3d 13, 14, 470 N.E. 2d 883.
 {¶ 35} Generally, prosecutors are entitled to considerable latitude in opening and closing argument. State v. Ballew, 76 Ohio St.3d 244,1996-Ohio-81, 667 N.E.2d 369. In closing arguments, a prosecutor may comment freely on "what the evidence has *Page 13 
shown and what reasonable inferences may be drawn there from." State v.Lott (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293. Moreover, because isolated incidents of prosecutorial misconduct are harmless, the closing argument must be viewed in its entirety to determine whether the defendant has been prejudiced. State v. Stevens, Montgomery App. No. 19572, 2003-Ohio-6249.
 {¶ 36} Prosecutorial misconduct will not provide the basis for reversal unless it can be said that the misconduct deprived the appellant of a fair trial based on the entire record. State v.Peterson, Cuyahoga App. No. 88248, 2007-Ohio-1837; State v. Lott, supra. "The touchstone of the analysis is the fairness of the trial, not the culpability of the prosecutor." State v. Gapen, 104 Ohio St.3d 358,2004-Ohio-6548, 819 N.E.2d 1047, quoting Smith v. Phillips (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78.
 {¶ 37} During the closing argument the prosecutor stated:
 {¶ 38} "Well, we know we found two casings at the crime scene .22 caliber. These casings to the exclusion of all other guns in the world, Mike Short told you, were fired from the gun right here, Jacob Rollins gun; the gun that he gave to Justin Lucas so that they could carry out their aggravated robbery." T.372.
 {¶ 39} The prosecutor also discussed the bullets which were recovered from the victim's body as follows:
 {¶ 40} "Remember the testimony when I asked Mike Short about these cartridges. These cartridges, yes definitely come from the gun. The bullets that he said had characteristics very similar to being fired from this gun because of the lands and grooves and the right twist and all that, but because of that Lubaloy coating, that he *Page 14 
can't match up to say that they are definitely fired from this gun, but these casings he said yes, to the exclusion of all guns." T.373.
 {¶ 41} Appellant's counsel objected to the argument and the court gave the following cautionary instruction:
 {¶ 42} "Well ladies and gentlemen, I'll give you this cautionary instruction now, this will be with you throughout the argument of counsel. What the lawyers say is not evidence. It will be for you to determine what the evidence is in the case. The lawyers are making arguments as to what they believe the evidence will show. With that cautionary instruction given to you, you may proceed." T.372-373.
 {¶ 43} During the trial, Michael Short testified that he microscopically compared the two .22 caliber Winchester Super-X cartridge cases collected from the rear parking area of 1123 13th Street, Northwest with test fires from the .22 caliber Lorcin used to shoot and kill the victim. Short testified that, in his opinion, the two spent cartridges collected from the scene were fired from the .22 caliber Lorcin to the exclusion of all other weapons. T.272-277. He further testified that the bullets collected from the victim's body had general rifling which included eight lands and grooves and a right hand twist which is indicative of a bullet fired from a .22 caliber Lorcin. T.277-285.
 {¶ 44} In the closing argument, the prosecutor did not argue the bullets collected from the victim's body matched the appellant's gun to the exclusion of all other guns but rather the prosecutor argued the shell casings collected at the scene matched appellant's gun to the exclusion of all other guns. The prosecutor's comments were consistent with the testimony of Michael Short that the shell casings collected at the scene came from the appellant's .22 caliber Lorcin to the exclusion of all other guns. *Page 15 
Accordingly, we do not find that the prosecutor misconstrued the evidence, committed misconduct and/or that the prosecutor's comments denied the appellant a fair trial.
 {¶ 45} Furthermore, the trial court gave a cautionary instruction. We presume that the jury follows and obeys the court's cautionary or limiting instructions. See State v. Franklin (1991), 62 Ohio St.3d 118,127, 580 N.E.2d 1.
 {¶ 46} Accordingly, appellant's second assignment of error is not well taken and is hereby overruled.
 III {¶ 47} In the third assignment of error, appellant argues that the trial court erred in denying his motion for an instruction on the defense of abandonment.
 {¶ 48} As a general rule, "[a]fter arguments are completed, a trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." State v. Comen (1990), 50 Ohio St.3d 206,210, 553 N.E.2d 640. Additionally, in a criminal case a trial court errs by failing to give a proposed jury instruction when: (1) the instruction is relevant to the facts of the case; (2) the instruction gives a correct statement of the applicable law; and (3) the instruction is not covered in the general charge to the jury. See e.g., Mentor v.Hamercheck (1996), 112 Ohio App.3d 291, 296, 678 N.E.2d 622. A decision of whether to give a jury instruction on an affirmative defense is reviewed for an abuse of discretion. State v. Getsy (1998),84 Ohio St.3d 180, 198, 702 N.E. 2d 866.
 {¶ 49} R.C. 2923.02(E) sets forth the defense of abandonment and provides: "[i]t is an affirmative defense to a charge that, prior to the commission of or attempt to *Page 16 
commit the offense, the actor terminated his complicity, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."
 {¶ 50} "In applying the foregoing provision, the courts of this state have held that the defendant's repudiation of criminal intent must be unequivocal before an instruction on abandonment will be warranted."State v. Brumley, Portage App. Nos. 89-P-2092 89-P-2099, (March 29, 1996), unreported, 1996 WL 210767 at paragraph 100: State v.Musgrave, Knox App. No. 98CA10, (April 24, 2000), unreported,2000 WL 502688; State v. Edwards, Lake App. No. 2001-L-005, 2002-Ohio-3359.
 {¶ 51} In the case sub judice, appellant admitted to law enforcement officers that he gave Lucas the gun that was used to shoot and kill Jason Halter. The testimony of Tona Delong established that the appellant knew and participated in the plan to rob the victim, drove around for hours waiting to lure the victim from his home and went with Lucas to the alley behind Jason Halter's house where he was shot.
 {¶ 52} Additionally, appellant's self serving statements that he did not participate in either the robbery or the shooting are contradicted by the dying declaration of the victim, appellant's actions after the shooting, appellant's statement to Delong and appellant's statements to the investigating officers.
 {¶ 53} In his initial statement to Officer Lawver, appellant stated that he "wasn't gonna set Jason up * * * I wasn't gonna rob him * * * I told him [Lucas] I'll come with you and like wait down the street for you to make sure you come back okay, but I'm not robbing him with you * * *."
 {¶ 54} However, in additional statements to the officers, appellant admitted the .22 Lorcin used in the murder was his gun. The appellant stated that he sold the gun to *Page 17 
Justin Lucas for twenty dollars. The appellant stated he [appellant] and Justin went to Jason Halter's home so "Justin could rob him [Jason Halter]." He stated that, when Jason appeared, Justin cocked the gun and said "freeze." The appellant stated that Jason started "whimpering and breathing real hard and shaking * * * like screaming." He stated that Justin told Jason to "shut the fuck up." He stated that Justin told him to stop calling his dogs or he would shoot him. He admitted that Justin shot Jason Halter, "as fast as he could pull the trigger." Appellant stated: "we just thought of Jason as a, as a punk, as a bitch, you know what I mean, he wasn't a man to us."
 {¶ 55} Furthermore, after the shooting, the victim lay dying in the bushes yelling, "they shot me. I am going to die. Oh God, I'm going to die. Can't believe they fucking shot me." T.155. Appellant claimed that, after the victim whistled for his dog, he got scared and ran from the alley to Tona's vehicle. However, none of the witnesses, with the exception of Tona DeLong, heard whistling. Furthermore, Mark Reynolds testified that the victim's dog was in the apartment at the time he heard the gunshots. Also, Tona Delong testified that the appellant arrived at the vehicle after Lucas, [1] and that appellant told her she would read about the incident in the paper the next day and that he thought that Jason Halter was hurt. Finally, in a statement to the police he stated that he, (appellant), was not a "snitch" and he "would do 25 if he has to."
 {¶ 56} Based on the record, we concur with the trial court. The evidence did not establish appellant unequivocally repudiated his involvement in the crimes. For these *Page 18 
reasons, we find the trial court did not err in failing to give a jury instruction on abandonment.
 {¶ 57} Accordingly, appellant's third assignment of error is not well taken and is hereby overruled.
 IV {¶ 58} In the fourth assignment of error, appellant argues that the verdict is against the manifest weight and sufficiency of the evidence. Specifically, appellant argues that the evidence was insufficient to establish that the appellant aided and abetted Justin Lucas in committing aggravated robbery and aggravated murder with a firearm and the jury clearly lost its way in finding the appellant guilty beyond a reasonable doubt.
 {¶ 59} In State v. Jenks (1981), 61 Ohio St.3d 259, 574 N.E.2d 492, the Ohio Supreme Court set forth the standard of review when a claim of insufficiency of the evidence is made. The Ohio Supreme Court held:
 {¶ 60} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id. at paragraph two of the syllabus.
 {¶ 61} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the *Page 19 
witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment." State v. Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52,678 N.E.2d 541 superceded by constitutional amendment on other grounds as stated by State v. Smith, 80 Ohio St.3d 89, 1997-Ohio-355,684 N.E.2d 668, citing State v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230,227 N.E.2d 212, syllabus at paragraph one.
 {¶ 62} The elements of the offense of aggravated murder pertinent to this case are as follows:
 {¶ 63} "(B) No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit * * * aggravated robbery * * *". R.C. 2903.01(B).
 {¶ 64} The elements of the offense of aggravated robbery pertinent to this case are as follows:
 {¶ 65} "(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following: *Page 20 
 {¶ 66} "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it." R.C. 2911.01(A)(1).
 {¶ 67} Ohio's complicity statute, R.C. 2923.03, states in pertinent part as follows:
 {¶ 68} "No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
 {¶ 69} "Solicit or procure another to commit the offense;
 {¶ 70} "Aid or abet another in committing the offense;
 {¶ 71} "Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;
 {¶ 72} "Cause an innocent or irresponsible person to commit the offense."
 {¶ 73} In the case sub judice, we find that the evidence demonstrated appellant aided and abetted Lucas in the shooting and killing of Jason Halter while attempting to commit an aggravated robbery with a firearm. Appellant admittedly supplied the gun that Lucas used in the offense. Appellant conspired with Lucas and DeLong to plan the robbery of Jason Halter which led to the shooting. Appellant drove around with Lucas and Delong smoking marijuana in Jason Halter's neighborhood. Appellant was present when DeLong sent a text message to Jason Halter confirming Jason would be leaving his house. Appellant accompanied Lucas and DeLong to Jason Halter's home. Appellant left the vehicle and went with Lucas into the alley behind Jason Halter's house to confront him with a firearm and rob him. Jason Halter left his apartment with nothing but a Sprite and left his dog behind with Mark Reynolds. Terry Barnby did not hear Jason Halter whistle for his dog and did not hear any confrontation before the *Page 21 
gunshots. Jason Halter was shot in the back of the neck, the upper right back and the upper right arm and was left dying in the bushes screaming "they shot me." Lucas arrived at DeLong's car first with appellant right behind. After arriving at the car, appellant told DeLong that Jason Halter had been hurt and she would read about it in the papers. Although Lucas arrived at DeLong's car with the gun after the shooting, the firearm, which matched the shell casings at the scene, and ammunition were recovered during the execution of a search warrant from appellant's home.
 {¶ 74} For these reasons, after viewing the evidence in a light most favorable to the prosecution, we find any rational trier of fact could have found the essential elements of the crimes proven beyond a reasonable doubt. Also, after reviewing the entire record, we do not find that the verdict is against the manifest weight of the evidence. *Page 22 
 {¶ 75} Accordingly, appellant's fourth assignment of error is not well taken and is hereby overruled.
 {¶ 76} The judgment of the Stark County Court of Common Pleas is hereby affirmed.
 Edwards, J. Farmer, P.J. and Delaney, J. concur. *Page 23 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Stark County Court of Common Pleas is affirmed. Costs assessed to appellant.
[1] During the direct examination of Terry Barnby, he testified as follows:
"State: If there had been screaming or yelling or whistling, would you have been able to hear it?
"Barnby: Definitely.
"State: And you heard nothing before the shots?
"Barnby: Nothing." T.159.
Mark Reynolds, Jason Halter's roommate, testified that when he was in the apartment he heard the gunshots. He stated that he kept the dogs in the apartment when he went down to investigate the gun shots. T.178 *Page 1