[Cite as *State v. Schwab*, 2013-Ohio-4349.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ATHENS COUNTY

STATE OF OHIO,                               :          Case No. 12CA39
                                             :
    Plaintiff-Appellee,                      :
                                             :          DECISION AND
    v.                                       :          JUDGMENT ENTRY
                                             :
TERRY SCHWAB,                                :          **RELEASED: 09/23/2013**
                                             :
    Defendant-Appellant.                     :
_____

APPEARANCES:

David J. Winkelmann, Athens, Ohio, for appellant.

Keller J. Blackburn, Athens County Prosecutor, and Merry M. Saunders, Athens County
Assistant Prosecutor, Athens, Ohio, for appellee.
_____
Harsha, J.

{¶1}     Terry Schwab appeals his convictions for various drug offenses and

argues they are supported by insufficient evidence and against the manifest weight of

the evidence.  The first set of charges stemmed from an incident on March 9, 2011, in

which Schwab's fiancée, Michelle Fidell, sold Oxycodone and her then minor daughter,

Tara Crego, sold Xanax (Alprazolam) to a confidential informant while inside Schwab's

home.  The second set of charges stemmed from an incident on April 1, 2011, in which

law enforcement initiated a traffic stop of a vehicle Schwab was driving, and he

purportedly gave Crego a bottle of Oxycodone which she hid in her bra.

{¶2}     Schwab contends no evidence shows he was complicit in the aggravated

trafficking of Oxycodone and in the trafficking of Alprazolam that occurred during the

March 9 incident.  However, the State introduced evidence that a few days before the

incident, Schwab told the informant he would have Xanax in a "few days" and would

have "the Xanax and the 30's," i.e., Oxycodone.  The State also offered evidence Fidell sold drugs for Schwab in the past, the drugs sold to the informant belonged to Schwab, and before the sales occurred, Schwab nodded his approval for the Xanax sale and either told Crego to give the informant "what she wants" or to "[j]ust give her anything." Based on the State's version of events, the jury could reasonably find that Schwab aided and abetted Fidell and Crego in the transactions and return guilty verdicts.  The jury did not clearly lose its way and create such a manifest miscarriage of justice that we must reverse the convictions.  The convictions are not against the manifest weight of the evidence and sufficient evidence supports them.

{¶3}    Next, Schwab complains about his conviction for corrupting another with drugs for the March 9 incident.  The jury found he corrupted Crego with Oxycodone, but the State presented no evidence he administered or furnished Crego with that drug during the incident.  It is clear from the evidence that Fidell handled the sale of Oxycodone while Crego handled the Xanax sale.  Therefore, we agree insufficient evidence exists to support the conviction and reverse it.  This decision renders Schwab's manifest weight argument on this conviction moot.

{¶4}    Schwab also challenges his conviction for corrupting another with drugs (Oxycodone) during the April 1 incident and argues there is no evidence he furnished or administered the drug to Crego.  However, Crego testified that after police initiated the traffic stop, Schwab handed her a pill bottle of Oxycodone, which she hid in her bra. Schwab and a passenger snorted pills from this bottle during their road trip.  The jury could infer that Schwab knowingly provided or supplied Crego with the bottle in order to conceal it from police and avoid criminal liability.  The jury could reasonably return a

guilty verdict based on the State's version of events. The conviction is not against the manifest weight of the evidence and is supported by sufficient evidence.

{¶5} Finally, Schwab challenges his conviction for complicity to aggravated possession of drugs based on the April 1 traffic stop. However, from Crego's testimony the jury could reasonably conclude Schwab handed her the bottle of Oxycodone and thereby knowingly aided or abetted her in possessing a schedule II controlled substance. Therefore, we find this conviction is not against the manifest weight of the evidence and is supported by sufficient evidence.

I. Facts

{¶6} The Athens County grand jury indicted Schwab on one count of aggravated trafficking in drugs, two counts of corrupting another with drugs, one count of trafficking in drugs, and one count of aggravated possession of drugs. The matter proceeded to a jury trial, which produced the following evidence.

{¶7} Byron Guinther, an agent for the Ohio Department of Public Safety, testified that Patricia Vore agreed to become a confidential informant ("CI") after he caught her selling food stamps. On March 9, 2011, she made a controlled buy of three or four Xanax "bars" and one Oxycodone pill from Schwab's house. On April 1, 2011, another CI spoke to Schwab's fiancée, Michelle Fidell. From that conservation, Guinther understood that "[t]hey didn't have anything in hand at that time but [Schwab] was in route back * * *." Guinther learned Schwab and Crego were coming back from Columbus and what vehicle they would be in. He gave this information to law enforcement agents who initiated a traffic stop of the vehicle.

{¶8} Patricia Vore testified that she has a drug problem and is a felon.

Guinther caught her selling food stamps to buy heroin, so she agreed to become a CI to avoid prosecution for welfare fraud.  She told Guinther she could buy drugs from Schwab.  However, she was not confident about this, so before Vore officially became a CI she went to Schwab's home on her own to see if she could buy drugs.  Her friend Robert Degarmore was there, and she bought a "Roxy 30," i.e., Oxycodone, from him.  Schwab told Vore he would have Xanax "in a few days."  Vore also testified Schwab told her he would "have the Xanax and the 30's."

**{¶9}**   Vore made her first controlled buy from Schwab's house on March 9, 2011.  When she arrived, Schwab was on the phone, Fidell, and Crego were in the living room.  Vore asked about Xanax, and Crego pulled out a "big bag" of Xanax bars.  Crego "looked up at [Schwab] and he gave her like a nod, like go ahead and give her what she wants kind of, because she didn't know me." He also told Crego, "Give her what she wants," in regards to the Xanax.  Crego counted the bars out on a table.  Fidell also got pills out – she had "the 30's, the pills, or the 15's," i.e., the Oxycodone.  Vore negotiated with Fidell and ultimately bought Xanax bars and one Oxycodone pill.  Vore made two more controlled buys at Schwab's house but dealt with Fidell both times.

**{¶10}** Eighteen-year-old Tara Crego testified that she and her mom lived with Schwab for several years.  He had medical problems, and Crego and her mom helped administer his medications.  Crego suggested he abused pain medications – he snorted pills and took more than he could get through doctors.  Sometimes Crego went with him to Columbus when he had doctor's appointments.  On the way home, they would fill his prescriptions and four or five hours later people would come to buy drugs, typically "30's and Xanax."  People bought drugs multiple times a week.  Crego claimed Schwab told

her mom to sell his drugs for him.  Fidell did and gave him the money.

{¶11}  Crego testified about two incidents that occurred when she was 17.  On March 9, 2011, a woman came to the house and asked if "anybody had anything," and "we said yes."  Schwab told Crego to "[j]ust give her anything."  Fidell took the woman into the kitchen and "laid them out on the table * * *."  According to Crego, her mom and Schwab told her to give the woman Xanax bars.  Crego got a bag of Schwab's Xanax bars from a kitchen cabinet and counted out four.  The woman put her money on the table.  Crego sold four bars to the woman, and Fidell sold the woman "[a] 30."  Crego testified that this Oxycodone also belonged to Schwab.  The sale occurred in the kitchen, and during it, Schwab stayed in the living room on the phone.

{¶12}  On April 1, 2011, Crego went with Schwab and Degarmore to Columbus.  During the road trip, Schwab and Degarmore each snorted two Oxycodone pills from a bottle in Schwab's pocket.  While in Columbus, Schwab briefly went inside a house of a person Crego did not know before the group went home.  Schwab handed his pill bottle to Crego when police stopped them.  She thought he did so because he was scared or nervous and she was "underage" and "wouldn't have got checked or searched."  She hid the bottle in her bra but ultimately gave it to police.

{¶13}  Crego testified she was charged with various offenses in a juvenile court case due to these events.  She had an adjudicatory hearing and pleaded guilty to aggravated possession of drugs, tampering with evidence, and trafficking in drugs – all felonies.  However, if she testified truthfully against Schwab her case would be "disposed of as a misdemeanor and not as a felony."  On cross, Crego admitted that when she first spoke to police, she did not tell them Schwab did anything wrong.

{¶14} Robert Degarmore testified that on April 1, 2011, he and Crego accompanied Schwab to Columbus so Schwab could get some pills. Schwab went alone into a house there for a few minutes before the group headed home. Degarmore claimed Schwab did not show him any pills but admitted they "did two pills" together on the way home. Later the police stopped them, and Crego gave the officers a bottle of pills. He did not know how Crego got the bottle, but Schwab was the last person he had seen with it. Degarmore claimed that during his first police interview, he lied about what he knew because he was under the influence of drugs and trying to save his "own ass."

{¶15} Michelle Fidell testified she had two felony convictions and was incarcerated. Her first conviction was for selling Oxycodone in Schwab's house in 2010. The second was for the March 9, 2011 incident. In exchange for her truthful testimony, the State agreed to not oppose judicial release on her 2010 case. Fidell denied ever selling drugs for Schwab and gave inconsistent testimony on whether she ever sold his drugs without his consent. Fidell claimed that she normally sold her own pills. She gave inconsistent testimony on Schwab's level of awareness of her activities. Fidell testified that she sold her own pills on March 9, 2011 "[a]s far as I can remember." She could not remember if she had someone waiting to buy pills that Schwab was bringing from Columbus on April 1, 2011.

{¶16} The State presented evidence that the pill bottle seized during the traffic stop contained 146 Oxycodone pills. The bottle indicated it contained 84, 15 milligram tablets of Oxycodone prescribed to Schwab and that he was to take one tablet three times a day. According to a report on Schwab's prescription medications, a doctor had last prescribed him 84, 15 milligram Oxycodone pills on March 14, 2011. Guinther

testified that during an interview with police, Schwab claimed he sometimes took 12 pills a day. However, on the recording, Schwab also claimed he sometimes took less. Schwab suggested the pill bottle contained more pills than the bottle said because he put pills from other prescriptions in it. He denied knowing Crego had the pills during the stop but claimed she sometimes carried his pills in her bra. Schwab claimed that in the past, he was shocked to learn Fidell had sold his pills. He claimed he never sold drugs and denied knowledge that anyone recently bought drugs in his home.

{¶17} For the March 9 incident, the jury found Schwab guilty of: 1.) complicity to aggravated trafficking in drugs (Oxycodone) in the vicinity of a juvenile; 2.) corrupting another with drugs (Oxycodone); and 3.) complicity to trafficking in drugs (Alprazolam) in the vicinity of a juvenile. For the April 1 incident, the jury found him guilty of: 1.) corrupting another with drugs (Oxycodone); and 2.) complicity to aggravated possession of drugs (Oxycodone) in an amount equal to or in excess of five times the bulk amount but less than 50 times the bulk amount. After sentencing, this appeal followed.[1]

## II. Assignments of Error

{¶18} Schwab assigns the following errors for our review:

Assignment of Error I: The Record Establishes that There was Insufficient Evidence to Convict Terry Schwab on All Counts.

Assignment of Error II: The Jury's Verdict on All Counts of the Indictment was Against the Manifest Weight of the Evidence.

## III. Manifest Weight of the Evidence and Sufficiency of the Evidence

### A. Standards of Review

{¶19} In his first assignment of error, Schwab contends insufficient evidence

---

[1] In the sentencing entry, the trial court did not mention the fact that several of the convictions were for complicity and instead suggested they were all for principal offenses.

exists to support his convictions.  As the Supreme Court of Ohio explained in *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 219:

> A claim raising the sufficiency of the evidence invokes a due process concern and raises the question whether the evidence is legally sufficient to support the jury verdict as a matter of law.  * * * In reviewing such a challenge, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

**{¶20}** In his second assignment of error, Schwab claims his convictions are against the manifest weight of the evidence.  "When an appellate court concludes that the weight of the evidence supports a defendant's conviction, this conclusion necessarily includes a finding that sufficient evidence supports the conviction." *State v. Puckett*, 191 Ohio App.3d 747, 2010-Ohio-6597, 947 N.E.2d 730, ¶ 34 (4th Dist).  Thus, if we find Schwab's convictions are supported by the weight of the evidence, that determination will also be dispositive on the issue of sufficiency even though the analysis for each argument is different. *Id.*

**{¶21}** "In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed." *State v. Brown*, 4th Dist. Athens No. 09CA3, 2009-Ohio-5390, ¶ 24, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).  We "may not reverse a conviction when there is substantial evidence upon which the trial court could

reasonably conclude that all elements of the offense have been proven beyond a reasonable doubt." *State v. Johnson*, 58 Ohio St.3d 40, 42, 567 N.E.2d 266 (1991).

**{¶22}** Even in acting as a thirteenth juror we must still remember that the weight to be given evidence and the credibility to be afforded testimony are issues to be determined by the trier of fact. *State v. Frazier*, 73 Ohio St.3d 323, 339, 652 N.E.2d 1000 (1995). The fact finder "is best able to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Thus, we will only interfere if the fact finder clearly lost its way and created a manifest miscarriage of justice.

### B. The March 9 Incident

**{¶23}** For the March 9 incident, the jury found Schwab guilty of complicity to aggravated trafficking in Oxycodone and to trafficking in Alprazolam. R.C. 2923.03, the complicity statute, states:

> (A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
>
> (1) Solicit or procure another to commit the offense;
>
> (2) Aid or abet another in committing the offense;
>
> (3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;
>
> (4) Cause an innocent or irresponsible person to commit the offense.
>
> * * *

**{¶24}** "To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted,

encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus. " '[T]he mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor.' " *Id.* at 243, quoting *State v. Widner*, 69 Ohio St.2d 267, 269, 431 N.E.2d 1025 (1982).

**{¶25}** R.C. 2925.03(A)(1), the trafficking statute at issue, states: "(A) No person shall knowingly do any of the following: (1) Sell or offer to sell a controlled substance or a controlled substance analog[.]" If the person sells Oxycodone, a schedule II drug, the offense is aggravated trafficking in drugs. R.C. 2925.03(C)(1); R.C. 3719.41, Schedule II(A)(1)(n). If the person sells Alprazolam (Xanax), a schedule IV drug, the offense is trafficking in drugs. R.C. 2925.03(C)(2); R.C. 3719.41, Schedule IV(B)(1).

**{¶26}** Schwab does not dispute the fact that the trafficking offenses occurred in his home on March 9, 2011, or that they occurred in the vicinity of a juvenile. However, he denies complicity to them. He claims Crego and Fidell had access to his medications and sold them without his knowledge. Schwab claims the only evidence of his complicity is the "prosecutor's testimony that he told Crego to go ahead and give Vole [sic] pills on March 9, 2011." (Appellant's Br. 5). And if he did make a statement on the "buy tape" to the effect that someone should give her want she wants, that "may well have been [his] response to a question by whomever he was talking to on the telephone." (Appellant's Br. 5). Later in his brief, Schwab acknowledges "several inferences" could be drawn about what happened on March 9. The "preferred"

inference "lead[s] to the conclusion that Fidell and Crego removed drugs that [he] had been stockpiling for personal use and sold them to Vore while [he] was on the telephone in the other room." (Appellant's Br. 7). Schwab highlights the fact that Vore bought drugs from Fidell two more times.

{¶27} However, the evidence adduced at trial established more than Schwab's "mere presence" in the house while Crego and Fidell trafficked in drugs. Crego testified without objection that people came to Schwab's house multiple times a week to purchase his Oxycodone and Alprazolam. Crego testified that Schwab told Fidell to sell the drugs for him, which Fidell did and gave Schwab the money. According to Vore's testimony, a few days before the March 9 incident she purchased Oxycodone at Schwab's house. Schwab told her that he would have Xanax "in a few days." And Schwab said he would "have the Xanax and the 30's." Vore testified that when she went to the house on March 9, and asked about the Xanax, Crego pulled out a bag of bars. Before Crego sold them, she "looked up at Terry and he gave her like a nod, like go ahead and give her what she wants kind of, because [Crego] didn't know me." Vore testified that Schwab told Crego, "Give her what she wants," in regards to the Xanax. Crego also testified that Fidell and Schwab told her to give Vore the Xanax bars. Crego claimed Schwab said to "[j]ust give [Vore] anything." And Crego testified that the Oxycodone and Alprazolam which she and Fidell sold to Vore belonged to Schwab.

{¶28} This evidence reasonably supports the conclusion that Schwab knowingly encouraged or assisted Fidell and Crego in trafficking Oxycodone and Alprazolam, i.e., he aided or abetted them. We need not consider whether the jury could have also concluded the evidence fit one of the other types of complicity in R.C. 2923.03(A). The

jury was free to conclude that Schwab intentionally stayed in the living room while his fiancée and her daughter sold his drugs in the kitchen in an effort to shield himself from criminal liability.  The jury was likewise free to disbelieve Fidell's testimony and Schwab's statement to the effect that she never sold drugs for him, particularly in light of the close relationship they share.

{¶29}  After reviewing the entire record, we cannot say that the jury lost its way or created a manifest miscarriage of justice when it found Schwab guilty of complicity to aggravated trafficking in drugs and to trafficking in drugs.  Accordingly, we find those convictions are not against the manifest weight of the evidence.  Thus, we necessarily also conclude that sufficient evidence supports these convictions.  We overrule the first and second assignment of error to the extent Schwab challenges these convictions.

{¶30}  Next, we address Schwab's conviction for corrupting another with drugs during the March 9 incident.  R.C. 2925.02, the statute on this offense, provides:

(A)  No person shall knowingly do any of the following:

(4)  By any means, do any of the following:

(a) Furnish or administer a controlled substance to a juvenile who is at least two years the offender's junior, when the offender knows the age of the juvenile or is reckless in that regard[.]

* * *

The jury found Schwab corrupted another with Oxycodone, a schedule II drug, during this incident.  This made his conviction a second degree felony.  R.C. 2925.02(C)(1).

{¶31}  Schwab does not dispute the fact that he knew Crego was a juvenile when the March 9 incident occurred.  He also does not dispute the fact that she was at least two years his junior.  Instead, he appears to argue that he did not knowingly furnish or

administer Oxycodone to her during the incident.

{¶32} Administer means "the direct application of a drug, whether by injection, inhalation, ingestion, or any other means to a person or an animal." R.C. 3719.01(A). *See* R.C. 2925.01(A). We agree the record lacks any evidence that Schwab administered Oxycodone to Crego during the March 9 incident.

{¶33} The Revised Code does not define "furnish," and the parties dispute the meaning of the word. "Statutory interpretation presents a legal issue we review de novo." *Denuit v. Ohio State Bd. of Pharmacy*, 4th Dist. Jackson Nos. 11CA11 & 11CA12, 2013-Ohio-2484, ¶ 30. "The primary goal in construing a statute is to ascertain and give effect to the intent of the legislature." *In re M. W.*, 133 Ohio St.3d 309, 2012-Ohio-4538, 978 N.E.2d 164, ¶ 17. "When analyzing a statute, we first examine its plain language and apply the statute as written when the meaning is clear and unambiguous." *Id.* We must "read words and phrases in context and construe them according to the rules of grammar and common usage." *Id.*, citing R.C. 1.42. If a statutory term is not defined, " 'it should be accorded its plain and ordinary meaning.' " *State ex rel. Data Trace Information Servs., L.L.C. v. Cuyahoga Cty. Fiscal Officer*, 131 Ohio St.3d 255, 2012-Ohio-753, 963 N.E.2d 1288, ¶ 49, quoting *Rhodes v. New Philadelphia*, 129 Ohio St.3d 304, 2011-Ohio-3279, 951 N.E.2d 782, ¶ 17. " 'Courts have used dictionary definitions to determine the plain and ordinary meaning of a statutory term.' " *Denuit* at ¶ 30, quoting *State v. Jackson*, 12th Dist. Butler No. CA2011-06-096, 2012-Ohio-4219, ¶ 34.

{¶34} *Black's Law Dictionary* 466 (Abridged 6th Ed.1991) defines "furnish" to mean "[t]o supply, provide, or equip, for accomplishment of a particular purpose." For

the March 9 incident, we conclude there is no evidence Schwab supplied, provided, or equipped Crego with Oxycodone for any purpose. All of the evidence indicates Crego handled the Xanax and Fidell handled the Oxycodone during the transaction with Vore. Because no evidence exists that Schwab furnished or administered Oxycodone to Crego during the March 9 incident, we find there is insufficient evidence to support that conviction for corrupting another with drugs and reverse it.

{¶35} We sustain the first assignment of error concerning the conviction for corrupting another with drugs for the March 9 incident. This decision renders moot Schwab's second assignment of error concerning this conviction. *See* App.R. 12(A)(1)(c). "A reversal based on the weight of the evidence * * * can occur only after the State both has presented *sufficient evidence* to support conviction and has persuaded the jury to convict." (Emphasis sic). *Thompkins*, 78 Ohio St.3d at 388, 678 N.E.2d 541, quoting *Tibbs v. Florida*, 457 U.S. 31, 42-43, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).

### C. The April 1 Incident

{¶36} Next, Schwab challenges his convictions that stem from the April 1 traffic stop – corrupting another with drugs (Oxycodone) and complicity to aggravated possession of drugs. We set forth the pertinent law on corrupting another with drugs and quoted the relevant portions of the complicity statute above. R.C. 2925.11(A), the drug possession statute at issue, provides: "No person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog." "If the drug involved in the violation is a compound, mixture, preparation, or substance included in schedule I or II, with [certain exceptions] * * * whoever violates division (A) of this section is guilty of

aggravated possession of drugs." R.C. 2925.11(C)(1). Oxycodone is the schedule II controlled substance at issue here. Schwab does not dispute the jury's finding that the amount of Oxycodone police seized was equal to or in excess of five times the bulk amount but less than 50 times the bulk amount.

**{¶37}** Schwab complains that despite Crego's plea in juvenile court, "there is no evidence that she tampered with evidence or trafficked in drugs on [April 1, 2011]." (Appellant's Br. 6). However, such proof is not necessary for either conviction at issue. Schwab also claims there is "no evidence that [he] intended to sell the drugs contained in the pill bottle," and the evidence points only to "personal use" by him and Degarmore. (Appellant's Br. 6). Likewise, evidence of intent to sell is not necessary for either charge.

**{¶38}** Later in his brief, Schwab contends that the "April 1, 2011 incident is * * * easily explained by concluding that [he] had the pills that were later discovered * * * on his person before leaving the Nelsonville residence. Neither Crego nor Degarmore saw what [he] did inside the rresidence [sic] in Columbus, and Cregor [sic] testified that [he] took pills from the same bottle on the to [sic] Columbus as well as coming back. The better conclusion is that the drugs had been on [his] person during the entire trip and that they had been stockpiled for his personal use." (Appellant's Br. 7).

**{¶39}** We find this argument confusing. Schwab seems to contend the pills Crego had were prescribed to him, so he *and* Crego could legally possess them. He cites no legal authority to support this claim. He indicates the reason the number of pills in the bottle exceeded his most recent prescription is that he stockpiled them from past prescriptions. However, the jury was free to conclude Schwab lacked a prescription for

the pills seized.  The fact that Schwab gave the pills to Crego when police stopped them supports that conclusion.  And Schwab's stockpiling claim is inconsistent with evidence that suggests he was addicted to Oxycodone and complicit to trafficking in it.

**{¶40}**  Looking to the April 1 corrupting another with drugs charge, Schwab's argument focuses on whether he furnished or administered a controlled substance to Crego.  Ample evidence supports the jury's conclusion that he furnished her with Oxycodone.  Contrary to Schwab's argument, the State did not have to prove that he furnished Crego with the drug "for her own use."  (Appellant's Br. 6).  Again, Crego testified that Schwab handed her the bottle and she hid it in her bra after police initiated the stop.  Crego thought he gave her the bottle because he was scared or nervous and she was "underage" and "wouldn't have got checked or searched."  Based on this testimony, the jury could find Schwab knowingly supplied, provided, or equipped her with Oxycodone to conceal it from law enforcement and protect himself from criminal liability.

**{¶41}**  Moreover, the jury could conclude from Crego's testimony that Schwab aided and abetted her possession of the pill bottle full of Oxycodone.  Again, she testified that he handed her the pill bottle when police stopped them.  The jury could reasonably find he knowingly assisted or encouraged her, i.e., he aided or abetted her, to commit the offense of aggravated possession of drugs.  We need not determine whether the jury could have also concluded the evidence fit one of the other types of complicity listed in R.C. 2923.03(A).

**{¶42}**  After reviewing the entire record, we cannot say that the jury lost its way or created a manifest miscarriage of justice when it found Schwab guilty of corrupting

another with drugs and complicity to aggravated possession of drugs for the April 1 incident.  We find those convictions are not against the manifest weight of the evidence. Thus, we necessarily also conclude that sufficient evidence supports them.

## IV. Conclusion

**{¶43}**  In sum, we overrule the first assignment of error except as to the corrupting another with drugs charge for the March 9 incident.  We reverse that conviction and remand for the court to discharge Schwab on that charge.  The second assignment of error is moot concerning the March 9 corrupting another with drugs charge.  In all other respects, we overrule the second assignment of error.

JUDGMENT AFFIRMED IN PART,
REVERSED IN PART,
AND CAUSE REMANDED.

## <u>JUDGMENT ENTRY</u>

It is ordered that the JUDGMENT IS AFFIRMED IN PART, REVERSED IN PART and that the CAUSE IS REMANDED.  Appellant and Appellee shall split the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Athens County Common Pleas Court to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted.  The purpose of a continued stay is to allow Appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Supreme Court of Ohio in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of sixty days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. & Hoover, J.:  Concur in Judgment and Opinion.


For the Court


BY: _____
         William H. Harsha, Judge


### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**